UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Nabeel A Khamis; Mutasim Ibrahim Abdallah
Mohammed; Monica H Timon; Magdi Yahia
Yunis; Ibris Amin; Karima Abrahim;
Algezafee Mohamed Hamid Hamid; Zainab
Babiker Abdelmahmoud Hassan; Zahara
Mohamed Hussein; Agok K Garang;
Mohieldin Dawed Omer; Rose Najore
Halisto; Nouraldein Abaker Hoss Bakht;
Mohmoud Ibrahim Abdulrazig; Abdallah
Adam Tahir Adam; Hamdi Ibrahim Amir;
Suliman Adam; Mubarak Yagoub Ibrahim
Rahma; Mustafa Mohammed Ali; Omer
Adam Omar; Ahmed Ibrahim Yusuf; Hussien
Bashir Haroun Adam; Rashid Hussein Younis
Ibrahim; Nourdinie Mahamad Yunis; Gamal
Adam Yagoub Hassan; Madibo Adam
Hassabllah Madibo; Salaheldin Idris Younis
Senien; Amer Mohammed Bakht Menawy; Adam
A Ibrahim; Nyanthiec Jam Awel; Noraldiem
Ahmed Ismail; Lado Yanga Jurkin; Muna
Yaqoub Mohamed; Ahmed Abdulrasoul
Mohammed Matar; Bahareldin Mohammad Omer
Abdalla; Abdu Norain Mohamed; Muotasim
Musa Alsafi; Mahsim Abakar Ismail; Mohamed
H Khater; Auar Ibrahim Yahya; Khaled Osman;
Yonies Hassan; Abdallah Ali Elnour; Jur Kucha;
Mohammed Ibrahim; Hanan Musa Tagal;
Abdalkarim Adam Mohammed Izzaldin; Kamal
Ahmad Mahmoud; Mary Abiech Akoon; Arbab
Ismail Ibrahim; Mohamed Adam Mohamed
Juma; Musab Arbab; Zahara Yekisuk; Mahamad
Ismail Ibrahim; Abdelkarim Adam Adam Ahmed
Musa; Adam Ibrahim Ismail; Monica Aluel
Ayuen; Mohammed Mahmoud Wara; Eman Ali;
Abobaker S Ibrahim; Younes Omar Adam; Atia
Kafi Kujur; Abualgesem A Abdalmoula; Ibrahim
Ahmed Ali; Abbakar El Sonosi Mohamed; John
Malwal; Mohamed O Fadhl; Yassien Daleel;

**JURY TRIAL DEMANDED**

Mary Dawod L. Lako; Aman Gai Garang Deng;
Amna Korashy; Ekalino M Awour Kur;
Mahmoud Abdalla Adam Abdalla; Hafiz
Abdulkarim Wadi; Samual Musa Abdalgadir;
Mubarak Suliman Rahma; Yasmeen Musa
Abelgadir; Abdulrazik Mahdi; Abdelkarim
Osman Hassan; Babiker Abdalla Haroun Abdalla;
Abdallah Ishag;

Plaintiffs,

– against –

BNP Paribas, S.A., a French corporation; and
BNP Paribas US Wholesale Holdings, Corp., a
Delaware corporation;

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## **COMPLAINT**

## TABLE OF CONTENTS

**PAGE(S)**

I.    INTRODUCTION.................................................................................................2

II.   THE PARTIES...............................................................................................11

    A.    Plaintiffs .................................................................................................11

    B.    Defendants ..............................................................................................47

III.  JURISDICTION AND VENUE .....................................................................48

IV.   FACTUAL BACKGROUND .........................................................................51

        1.    The al-Bashir Regime ...............................................................51

        2.    Sudan's 1997 Entry Into International Oil Markets.................52

        3.    To Capitalize on Oil Exports, the GOS Needed Access to
            "Petrodollars," Which BNPP Agreed to Provide......................54

    B.    U.S. Sanctions Implemented U.S. Policy Opposing the
          Government of Sudan's Persecution of Disfavored Sudanese
          Civilians and the Use of Oil Income to Finance Such Persecution ......56

    C.    BNPP Agreed and Conspired with the GOS to Provide Illegal
          Access to U.S. Financial Markets with the Understanding That
          This Would Sustain and Expand the GOS's Campaign of Violence
          and Internal Repression...........................................................................63

    D.    With Access to Petrodollars Provided by BNPP, Sudan's Exports
          of Oil and Revenues Rose Dramatically................................................68

    E.    As a Result of Increased Oil Revenues, Military Spending Grew,
          Both in Total Dollars and as a Percentage of Government Spending...................69

    F.    Sudan Used its Oil Revenue to Buy and Manufacture Weapons and
          Weapons Delivery Systems ...................................................................71

    G.    Well-Funded by Oil Revenues and Equipped with Newly
          Purchased Weapons, Sudan Increased its Violence Against
          Civilians, Including Plaintiffs. ...............................................................74

    H.    Plaintiffs' Injuries Were Foreseeable:  BNPP Knew the Atrocities
          in Sudan Were Funded By and an Intrinsic Part of the Government

of Sudan's Exploitation of Its Oil Resources, Which BNPP Made
Possible ...................................................................................................79

    1.    Contemporaneous Reporting of the Atrocities in Sudan and
the Connection to Oil .................................................................80

    2.    Three Companies, Talisman, Lundin, and OMV, Were
Forced to Withdraw from Sudan by Public Pressure ................84

I.    As a Result of an Array of Federal and State Investigations, BNPP
Agreed to Two Criminal Guilty Pleas, Two Cease and Desist
Orders, a Settlement Agreement, and a Consent Order .......................90

    1.    BNPP Pled Guilty to Violating U.S. Sanctions .........................91

    2.    BNPP Pled Guilty to Violating New York Law ........................93

    3.    BNPP Entered into Agreements with Federal and State
Regulators Admitting Substantial Wrongdoing and
Agreeing to Substantial Penalties .............................................95

**V.**    **THE CAUSES OF ACTION ALLEGED HEREIN ACTION ARE TIMELY........102**

**VI.**    **CAUSES OF ACTION ........................................................................104**

**VII.**    **PRAYER FOR RELIEF.......................................................................105**

## TABLE OF EXHIBITS

| **Document Name** | **Exhibit** |
|---|:---:|
| Information, *United States v. BNP Paribas* (S.D.N.Y., filed July 9, 2014) (Docket 14-CR-460-LGS No. 002) | A |
| Letter from Preet Bharara, United States Attorney for the Southern District of New York, Leslie Caldwell, Assistant Attorney General, Criminal Division, Department of Justice, and Jaikumar Ramaswamy, Chief, Asset Forfeiture and Money Laundering Section, Department of Justice, to Karen Patton Seymour, Esq., Sullivan & Cromwell LLP, *United States v. BNP Paribas, S.A.*, June 27, 2014. | B |
| Statement of Facts dated June 30, 2014, Ex. 2 to Plea Agreement, Dkt. No. 14-CR-00460-LGS Doc. No. 13 | C |
| Plea Agreement Between BNP Paribas SA and the District Attorney of the County of New York, June 30, 2014 | D |
| Exhibit A to Plea Agreement Between BNP Paribas SA and the District Attorney of the County of New York, June 30, 2014 | E |
| Cease and Desist Order Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended; Supervisory Cooperation Decision Applying the Joint Statement of French and US Banking Supervisors of May, 24th 2004, Dkt. No. 14-022-B-FB | F |
| Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, Dkt. Nos. 14-022-B-FB, 14-022-CMP-FB | G |
| Settlement Agreement between the U.S. Department of Treasury's Office of Foreign Asset Control ("OFAC") and BNP Paribas SA ("BNPP"), COMPL-2013-193659 | H |
| *In re BNP Paribas, S.A. New York Branch*, *Consent Order Under New York Banking Law § 44*, New York State Department of Financial Services ("DFS") | I |
| DFS Press Release, Cuomo Administration Announces BNP Paribas to Pay $8.9 Billion, Including $2.24 Billion to NYDFS, Terminate Senior Executives, Restrict U.S. Dollar Clearing Operations for Violations of Law (June 30, 2014) | J |

| **Document Name** | **Exhibit** |
|---|---|
| *BNP Paribas Sentenced for Conspiring to Violate the International Emergency Economic Power Act and the Trading with the Enemy Act, Justice News*, May 1, 2015 | K |
| Maps of Sudan | L-O |

Plaintiffs Nabeel A Khamis; Mutasim Ibrahim Abdallah Mohammed; Monica H Timon; Magdi Yahia Yunis; Ibris Amin; Karima Abrahim; Algezafee Mohamed Hamid Hamid; Zainab Babiker Abdelmahmoud Hassan; Zahara Mohamed Hussein; Agok K Garang; Mohieldin Dawed Omer; Rose Najore Halisto; Nouraldein Abaker Hoss Bakht; Mohmoud Ibrahim Abdulrazig; Abdallah Adam Tahir Adam; Hamdi Ibrahim Amir; Suliman Adam; Mubarak Yagoub Ibrahim Rahma; Mustafa Mohammed Ali; Omer Adam Omar; Ahmed Ibrahim Yusuf; Hussien Bashir Haroun Adam; Rashid Hussein Younis Ibrahim; Nourdinie Mahamad Yunis; Gamal Adam Yagoub Hassan; Madibo Adam Hassabllah Madibo; Salaheldin Idris Younis Senien; Amer Mohammed Bakht Menawy; Adam A Ibrahim; Nyanthiec Jam Awel; Noraldiem Ahmed Ismail; Lado Yanga Jurkin; Muna Yaqoub Mohamed; Ahmed Abdulrasoul Mohammed Matar; Bahareldin Mohammad Omer Abdalla; Abdu Norain Mohamed; Muotasim Musa Alsafi; Mahsim Abakar Ismail; Mohamed H Khater; Auar Ibrahim Yahya; Khaled Osman; Yonies Hassan; Abdallah Ali Elnour; Jur Kucha; Mohammed Ibrahim; Hanan Musa Tagal; Abdalkarim Adam Mohammed Izzaldin; Kamal Ahmad Mahmoud; Mary Abiech Akoon; Arbab Ismail Ibrahim; Mohamed Adam Mohamed Juma; Musab Arbab; Zahara Yekisuk; Mahamad Ismail Ibrahim; Abdelkarim Adam Adam Ahmed Musa; Adam Ibrahim Ismail; Monica Aluel Ayuen; Mohammed Mahmoud Wara; Eman Ali; Abobaker S Ibrahim; Younes Omar Adam; Atia Kafi Kujur; Abualgesem A Abdalmoula; Ibrahim Ahmed Ali; Abbakar El Sonosi Mohamed; John Malwal; Mohamed O Fadhl; Yassien Daleel; Mary Dawod L. Lako; Aman Gai Garang Deng; Amna Korashy; Ekalino M Awour Kur; Mahmoud Abdalla Adam Abdalla; Hafiz Abdulkarim Wadi; Samual Musa Abdalgadir; Mubarak Suliman Rahma; Yasmeen Musa Abelgadir; Abdulrazik Mahdi; Abdelkarim Osman Hassan; Babiker Abdalla Haroun Abdalla; Abdallah Ishag (collectively, "Plaintiffs"), through their undersigned attorneys, hereby bring this action and allege as follows:

1

## I.    <u>INTRODUCTION</u>

1.    This action seeks justice on behalf of Plaintiffs, who are among the victims of one of the greatest bank crimes of all time.  From 1997 to at least 2007, in criminal violation of U.S. sanctions that were intended to stop Sudan's terrorist activities and human rights abuses and of New York law, Defendant BNP Paribas, S.A., along with its affiliate Defendant BNP Paribas US Wholesale Holdings, Corp. (f/k/a BNP Paribas North America, Inc.), (collectively "BNPP") secretly conspired with the rogue government of Sudan and gave it forbidden access to the U.S. financial markets and U.S. dollar clearing services in New York.  By 2007, BNPP facilitated an astonishing quarter of Sudan's exports and a fifth of its imports.  BNPP's financial transactions for the government of Sudan, along with some other illicit transactions with Iran and Cuba, totaled at least as much as $190 billion dollars.  With BNPP's assistance, rather than being crippled by the U.S. sanctions, the government of Sudan exploited its oil resources by harming, killing, and displacing civilians living in oil rich regions and saw its revenues from oil dramatically increase, revenues it used to buy planes, helicopters and weapons, to fund its military and militias, and to escalate its campaign of unspeakable atrocities against its own people.

2.    Defendants' criminal conduct, which began in 1997, was a substantial factor in causing Plaintiffs' injuries that have persisted to the present.  Plaintiffs were the intended beneficiaries of the very sanctions that Defendants have been convicted, in New York, of violating. And Plaintiffs have suffered grave injury as a result of BNPP providing Sudan with the means to wage genocidal and unlawful attacks on civilians.  Without BNPP's willingness to break U.S. and New York law to provide Sudan with much needed dollars used to trade oil and buy arms, Sudan could not have engaged in the well-documented mass scale ethnic cleansing and violence against its disfavored population, including crude, indiscriminate bombings of their homes and villages, mass rape, torture, infection with HIV, loss of property and income, and displacement of hundreds

of thousands from their homes and property through the use of large scale weapons purchased after BNPP became the government of Sudan's bank providing it access to U.S. dollars. BNPP's clandestine, criminal conduct in conspiracy with the government of Sudan went far beyond ordinary commercial banking activity, as in the case of other multinationals sued for their business ventures with rogue governments.

3.      Defendant BNP Paribas, S.A. ultimately was caught by U.S. authorities, pled guilty to violating U.S. sanctions against doing business with Sudan and to committing a New York felony for falsifying business records, and was ordered to pay a criminal forfeiture of approximately $8.9 billion. But BNPP's ultimate victims, including Plaintiffs, have not been compensated for their injuries caused by BNPP's conduct. Plaintiffs, all of whom now lawfully live in the United States, now seek damages from BNPP.

*****

4.      In 1989, military officers under then-Colonel Omar al-Bashir seized power in Sudan. The military coup had the support of the National Islamic Front, an offshoot of the Muslim Brotherhood.[1] As head of the military junta, al-Bashir became Sudan's president, chief of state, prime minister, and chief of the armed forces. The coup began what is now a decades-long pattern of serious human rights abuses, including genocide, in violation of international law and support for terrorism.[2] By the mid-1990s, the human rights abuses in Sudan were well known, including by BNPP, and attracted considerable international attention.

5.      At the same time, the Khartoum regime sought to exploit Sudan's rich oil reserves, knowing that money was crucial to keep it in power. Though Sudan's oil reserves had been known

---

[1] The National Islamic Front changed its name to the National Congress Party in 1998.

[2] Along with Syria and Iran, Sudan is one of only three countries designated by the U.S. State Department as a state sponsor of terrorism.

for many years, even by 1997, Sudan had not been able to produce sufficient oil for export, let alone enough oil to generate substantial revenue.  The exploitation of oil required access to the capital and the know-how needed to drill for oil, as well as access to international financial markets to export it at the highest price.

6.       Due to longstanding and economically compelling market forces, international oil transactions are priced in U.S. dollars ("petrodollars"), and overwhelmingly cleared through financial intermediaries in New York City that have large dollar deposits.  Sudan therefore needed access to the U.S. financial system to maximize its future oil revenue.  Conversely, if a country like Sudan desired to sell oil without access to U.S. dollars and the ability to clear transactions in New York or elsewhere in the United States, it would suffer a substantial discount, either having to barter its oil in exchange for other commodities or goods or sell it in other currencies.

7.       Sudan's development of its oil resources was linked to its human rights abuses not just through the government's desire to use oil revenue to stay in power.  Many of Sudan's oil rich regions were occupied by civilians opposed to the government of Sudan on the basis of ethnicity, religion, and longstanding political disagreements with successive Khartoum governments, particularly the military-Islamist regime that grabbed power in 1989.  To exploit its oil resources, the government of Sudan had used and would use its military and allied militias to harm, kill or displace hundreds of thousands of civilians from oil rich regions.

8.       In 1997, cognizant of Sudan's desire to exploit its oil resources and the link between that oil exploitation and human rights abuses, the United States enacted sweeping sanctions specifically to curtail and to stop the government of Sudan's human rights abuses and its support for global terrorism.  Pursuant to the International Emergency Economic Powers Act ("IEEPA")[3]

---

[3] International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq*.

and the Trading with the Enemy Act ("TWEA"),[4] President Bill Clinton imposed comprehensive criminal sanctions that, among other things, barred banks operating in the United States from extending credit to or facilitating or brokering U.S. dollar transactions for the government of Sudan and its agencies, instrumentalities, and controlled entities (collectively, the "GOS").  In 2006, President George W. Bush enacted further sanctions (collectively and together with their implementing regulations, the "U.S. Sanctions," or the "Sanctions").  The U.S. Congress and the Executive Branch thus recognized the causal link—*the precise causal link at issue in this case*—between the GOS's access to the U.S. financial system and the GOS's  atrocities against its civilians, including those from its oil exploitation.

9.     Given its nascent oil development, Sudan's meagre, pre-oil economy was particularly vulnerable to U.S. Sanctions.  The U.S. Sanctions, if observed, would have cut the GOS off from funding to exploit its oil resources and to export its oil at market prices, thereby negatively impacting the GOS's revenues from its oil and limiting the GOS's ability to commit atrocities.  Similarly, the U.S. Sanctions, if observed, would have cut the GOS off from importing goods using dollar-denominated lines of credit, thereby negatively impacting its buying power and its ability to acquire goods, such as planes, helicopters and weapons.  Thus, U.S. Sanctions were designed and intended to have an adverse impact on the GOS's economy, thereby limiting the al-Bashir regime's solidification of its hold on power and its ability to wage its campaign of atrocities against its civilian population.

10.    But the U.S. Sanctions did not have their intended or expected impact because BNPP flagrantly and knowingly chose to violate them.  In 1997, just as the first U.S. Sanctions were going into effect, knowing that the GOS was a terrorist state and that it was committing

---

[4] Trading with the Enemy Act, 50 U.S.C. §§ 4303 *et seq*.

atrocities against civilians, BNPP agreed and conspired with the GOS to circumvent U.S. Sanctions and prevent the Sanctions from having their intended and expected impact on the GOS and Sudan's economy and the protection of Sudan's victims.  BNPP became the GOS's sole correspondent bank in Europe and provided the GOS with the means to evade U.S. Sanctions via concealed access to U.S. financial markets and clearing facilities in New York City.

11.    Specifically, BNPP assisted the GOS with its oil exploitation efforts, which were well-known to include harming, killing and displacing people in oil rich regions.  In turn, assisting the GOS in its export of oil, BNPP gave the GOS resources to exploit additional oil resources. Thus, BNPP's U.S. Sanctions violations created a macabre feedback loop.  The resources that oil development generated allowed the GOS to purchase planes, helicopters and weapons, to manufacture weapons, and to fund militia.  In turn, the GOS violently harmed, killed and displaced more Sudanese civilians, including those it perceived as ethnically and politically "non-Arab" and those who were in the way of oil development.  Oil revenue was both the object and the *sine qua non* of its ability to carry out the mass destruction and extermination that it let loose on its own civilian population, including Plaintiffs.

12.    As recognized in the promulgation of the U.S. Sanctions themselves by Congress and the Executive Branch, in the experience of other countries subjected to U.S. sanctions like Iraq and Iran, and in the opinions of observers and experts, when complied with, U.S. sanctions are effective because the lion's share of international trade, particularly for commodities like oil that are priced in dollars, relies on access to the U.S. financial system.  Absent that access, countries need to export commodities and import goods through barter or through use of secondary currencies, both of which are significantly less efficient and result in less revenue from exports and more costly imports.  As a result, when U.S. sanction are observed, a country's economy

suffers, and it will inevitably have less economic resources with which to acquire weapons and oppress its people.

13.     By conspiring with the government of Sudan and giving it access to the U.S. financial system in the pursuit of illicit profits, BNPP enriched itself, undermined U.S. Sanctions and prevented their intended and expected effect, and assisted the terrorist, genocidal government of Sudan.  Thus, BNPP's Sanctions violations were a natural result of its conspiring with the government of Sudan and were a substantial factor in causing the atrocities suffered by Plaintiffs.

14.     The injuries to Plaintiffs were also reasonably foreseeable by BNPP.  As documented in its own internal files, BNPP knew that its violations of Sanctions were linked to human rights abuses.  BNPP knew that the Sanctions were intended and expected, if observed, to protect the civilians of Sudan, including Plaintiffs. BNPP knew that the GOS wanted BNPP's assistance to increase its ability to exploit its oil resources which directly involved human rights abuses.  BNPP knew that the GOS wanted BNPP's assistance to increase the GOS's economic resources both for its exports and imports.  And BNPP knew, as documented in contemporaneous reports by the United States, Canada, international NGOs, and the media, that the GOS used those increased economic resources to increase its military expenditures and to escalate its human rights abuses.  Among other things, BNPP knew about the GOS's acquisition of advanced military hardware and funding of militias with those additional resources, about the GOS's manufacture of weapons, and about the GOS's committing human rights atrocities using that military hardware and those militias.  Thus, by violating the Sanctions, BNPP knew that Sudan's human rights abuses would escalate, not be curtailed.

15.     BNPP's deliberate violation of U.S. Sanctions aimed at preventing the GOS's human rights abuses against the Sudanese people is incontestable.  To no avail, responsible BNPP

officials raised internal alarms, including by executives, that if BNPP's illegal support for the GOS became known externally, it would demonstrate BNPP's complicity in the GOS actions. BNPP also did everything it could to keep its complicity secret, including falsifying business records.

16.     Ultimately, the United States and the State of New York discovered BNPP's crimes, through years-long investigations and the exercise of prosecutorial discretion by the United States and New York. Five federal and state agencies, primarily in New York, extensively investigated Defendants' illicit financial dealings with Sudan as well as with Iran and Cuba:

a.      The U.S. Department of Justice ("DOJ") through the U.S. Attorney for the Southern District of New York;

b.      The New York County District Attorneys' Office ("DANY");

c.      The Federal Reserve Board of New York ("FRB-NY");

d.      The U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"); and

e.      The New York Department of Financial Services ("DFS").

17.     These investigations culminated in two criminal guilty pleas in this judicial district in 2015—to a federal felony, a New York felony, and a New York misdemeanor, two cease and desist orders, a settlement agreement, and a consent order. In 2014, BNPP pled guilty to conspiracy to violate the IEEPA and the TWEA by processing billions of dollars of transactions through the U.S. financial system on behalf of Sudanese, Iranian, and Cuban entities subject to U.S. economic sanctions, and BNPP pled guilty to violation of the New York State Penal Law[5] by falsifying business records with the intent to commit, aid, or conceal another crime. OFAC's investigation resulted in a settlement agreement with BNPP, pursuant to which OFAC fined BNPP over $960 million and BNPP agreed to terminate its Sanctions violating conduct. Similarly, DFS's

---

[5] New York State Penal Law Section 175.10.

investigation resulted in a consent decree, pursuant to which DFS fined BNPP over $2 billion and BNPP agreed to make reparations and restitution in the amount of $1.05 billion.  Further, BNPPNY was suspended for clearing U.S. dollar transactions for other BNPP branches for a year, and BNPP could not act as a U.S. dollar clearing bank for unaffiliated third-party banks for two years.

18.    The array of enforcement actions, regulating BNPP's past and future conduct, taken by both the United States and New York demonstrates their critical interest in preserving New York as a global financial center and in ensuring that New York is not used to aid in committing human rights abuses.  Indeed, New York was central to BNPP's illegal activities.  BNPP aided and abetted and conspired with the GOS to evade Sanctions through various means and methods in New York.   These included, among other things: accepting and following the direction of sanctioned entities to structure financial transactions on behalf of blocked entities in New York to evade the Sanctions; actually processing prohibited transactions in New York through the facilities of BNPPNY and other New York based banks; and in a felony violation of New York law, using false and fraudulent transaction descriptions and transmittal messaging at BNPPNY and the other New York banks to conceal that the transactions were being processed on behalf of blocked entities.   These actions, without which BNPP would not have been able to aid the Sudanese government, undermined not only the Sanctions regime but also the integrity of the New York financial system.

19.    In 2015, BNPP was sentenced to forfeit approximately $8.9 billion as part of its agreement to plead guilty.[6]  OFAC also levied a fine of $963 million in a parallel civil settlement.

---

[6] Note, although there were separate fines and penalties, these fines and penalties were deemed satisfied by virtue of BNPP's payment of the approximately $8.9 billion forfeiture.

Approximately 70% of BNPP's criminal asset forfeiture addressed BNPP's activities with the GOS.  BNPP's criminal activity starkly contrasts with ordinary commercial or banking activity.

20.     The forfeiture and fine, none of which went to the victims of BNPP, are among the largest penalties ever levied.  Nevertheless, as reported by the Wall Street Journal's Editorial Board, BNPP "got off easy in its plea deal with U.S. authorities."[7]

21.     Plaintiffs, who lawfully immigrated to the United States under extreme circumstances, allege the claims herein, and seek damages from Defendants to compensate for the atrocities they have suffered, atrocities for which they have never received any compensation.

*****

22.     This action is limited in scope.  It involves the legality of the actions of BNPP, all of which are private actors that went far beyond ordinary commercial or banking activity to engage in clandestine criminal conduct.  The immediate GOS perpetrators of atrocities against Plaintiffs, some indicted by the International Criminal Court ("ICC"), are not parties here and, unlike the criminally-convicted BNPP, are beyond the remedial reach of U.S. courts.  Plaintiffs' claims do not seek relief that would require the Court to intervene against or declare invalid any official, governmental act of the GOS.  To the contrary, the claims here arise out of the horrific, settled finality of the GOS's transnational crimes.  Plaintiffs seek only to obtain damages from the private parties whose deliberate, criminal conduct were a substantial factor in these acts and the resultant harm.

---

[7] Editorial Board, *BNP Got Off Easy*, Wall St. J. Asia, July 3, 2014, at 9.  The Board also noted that the bank was "lucky not to lose its U.S. banking license." *Id.*

## II.    THE PARTIES

### A.    Plaintiffs

23.    Each Plaintiff is from Sudan, including the portion of Sudan that, in 2011, became the Republic of South Sudan ("South Sudan").  Each Plaintiff entered and resides lawfully in the United States or is a U.S. citizen.

24.    Each Plaintiff claims significant injuries that began in Sudan, including the part that is now South Sudan, from between November 1997 and December 2011.  As set out in detail below, Plaintiffs suffered extraordinary and unspeakable harm at the hands of the GOS on the basis of Plaintiff's race, religion, tribal affiliation, ethnicity and/or political affiliation.  These actions, which were a foreseeable result of BNPP's assistance to the GOS, violated human dignity and fundamental rights including, among others, the right to life; physical and mental integrity; personality; family life, privacy, and the home; and property.

25.    Before fleeing to the United States, Plaintiffs resided primarily in three main geographic areas: (1) southern Sudan, including the states of Upper Nile, Jonglei, the Equatorias, Western Bahr el Ghazal, Northern Bahr el Ghazal, and Unity; (2) the contested border region of Abyei; and (3) in the north, the Nuba Mountains region of Southern Kordofan, the Darfur region, and Khartoum, Sudan's capital where many groups fled to escape the violence in their homelands. Plaintiffs are culturally diverse and practice various religions.  Those Plaintiffs from southern Sudan, now the separate country of South Sudan, generally practice traditional African religions or Christianity, while those who reside in the west (Darfur) are primarily Muslim.  These regions are reflected on the maps attached hereto as **Exhibits L-O**.

26.    Unlike Sudan's ruling elite, which come predominantly from the Nile Valley in and around Khartoum, and which have "riverine" identity, Plaintiffs are overwhelmingly black Africans.  Many of their Arab countrymen, and the Khartoum-based riverine elite in particular,

often refer to them as "zurga," a racial slur frequently used in Darfur, or "abid," a term which is predominately used in Central and Southern Sudan and means slave. Successive governments in Khartoum stretching back decades have marginalized the peoples living away from the Nile, who are Arabs as well as Africans. This marginalization has always been stratified and layered such that some groups (who often self-define as "African") have faced greater degrees of exclusion and violent repression than others. The Sudanese state has long sought to assimilate the different people in the country to the riverine identity, including through the promotion of one language (Arabic) and one faith (Islam) at the expense of others. Those people who have sought to resist that effort (like the people in the South, Darfur, and the Nuba Mountains in Central Sudan) have faced the brunt of state-organized violence. This marginalization and persecution escalated significantly in 1997.

27.    After fleeing the GOS's violence, many of the Plaintiffs experienced serial displacement, starvation and disease. They were living in abject poverty and suffering from physical injuries, loss of all their possessions, and emotional scars inflicted by the GOS and its proxies.

28.    Plaintiffs arrived in the United States with nothing and continue to suffer from physical and emotional injuries.

29.    Plaintiff Nabeel A Khamis was born in 1994 and resides in Denver, Colorado. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, members of the GOS security services attacked Plaintiff's village in Marla. Plaintiff witnessed bombing from airplanes or helicopters, shelling from artillery or tanks, and fighters on foot, as well as killing of civilians and looting and burning of property. He was forcibly displaced from his home, fleeing

Sudan, and later lawfully immigrated to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

30. Plaintiff Mutasim Ibrahim Abdallah Mohammed was born in 1998 and resides in Kansas City, Missouri. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2000, the government military and Janjaweed attacked Plaintiff's village in Marla, South Darfur. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, use of swords or knives, burning of homes, use of chemical weapons, beating, raping, kidnapping and killing of civilians as well as stealing and killing of livestock. Plaintiff's grandfather and uncle were killed and his parents and siblings were injured during the attack. Plaintiff's home was burned down. He was forcibly displaced from his home, fleeing Sudan and later lawfully immigrated to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer anxiety, fear for his safety and the safety of his family members, nightmares and anger, as well as a loss of property and sources of income.

31. Plaintiff Monica H Timon was born in 1971 and resides in Laveen, Arizona. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP— Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1998, government soldiers attacked Plaintiff's village in Juba. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, military vehicles, heavy machine gunfire, and beating, kidnapping, and killing of civilians. Plaintiff's hands were injured in the attack and she saw the bodies of her loved ones left on the ground. She was forcibly displaced from her home, fleeing Sudan and later lawfully

immigrated to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer anxiety, fear for her safety and the safety of her family members, intrusive thoughts, nightmares, feeling distant from her loved ones and feeling as if she does not have a future, as well as a loss of property and sources of income.

32.     Plaintiff Magdi Yahia Yunis was born in 1960 and resides in Aurora, Colorado. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, government soldiers, security services and the Janjaweed attacked Plaintiff's village near Khartoum. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, fighters on horses or camels, military vehicles, gunfire, use of swords or knives, burning of homes, beating, kidnapping and killing of civilians as well as stealing and killing of livestock. Plaintiff lost his home and farm in the attack. He was forcibly displaced from his home, fleeing Sudan and later lawfully immigrated to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work or receive an education, difficulty concentrating, flashbacks, feeling easily startled, loss of interest in activities he used to enjoy and feeling as if he does not have a future, as well as a loss of property and sources of income.

33.     Plaintiff Ibris Amin was born in 1980 and resides in Denver, Colorado.  While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP— Government of Sudan soldiers, security forces, and/or the Janjaweed.  In 2005, the government

14

soldiers, the Janjaweed or pro-government militia attacked Plaintiff's village in South Darfur. Plaintiff witnessed aerial bombing, fighters on foot, fighters on horses or camels, gunfire, use of swords or knives, burning of homes as well as stealing and killing of livestock. His home was bombed and burned and his property was stolen. Plaintiff's uncle was killed in the attack. He was forcibly displaced from his home, fleeing Sudan and later lawfully immigrated to the United States. Plaintiff is a lawful permanent resident of the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer fear for the safety of his family members, intrusive thoughts, nightmares, flashbacks as well a loss of property and sources of income.

34.    Plaintiff Karima Abrahim resides in Phoenix, Arizona. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, security services, Janjaweed, and/or pro-government militia attacked Plaintiff's village in Central Darfur. Plaintiff witnessed fighters on horses or camels, gunfire, use of swords and knives, setting of fires, stealing of livestock, and kidnapping of civilians. Plaintiff also witnessed members of her family being injured and killed, the looting and destruction of her home and village, and loss of livestock. She was forcibly displaced from her home, fleeing Sudan, and later lawfully immigrated to the United States. Plaintiff is a U.S. citizen. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer disease, depression, anxiety, fear for her safety and the safety of her family members, intrusive thoughts, nightmares, trouble sleeping, feeling distant from her loved ones, feeling as if she does not have a future, trauma, as well as a loss of property and sources of income.

35.    Plaintiff Algezafee Mohamed Hamid Hamid was born in 1973 and resides in Phoenix, Arizona.  While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed.  In 2005, Janjaweed and/or pro-government militia attacked Plaintiff's village in Abu Hamra. Plaintiff witnessed gunfire, heavy machine guns on trucks, beatings with hands, sticks, or other objects, beating and killing of civilians in detention.  Plaintiff witnessed fighters coming out of the woods and opening fire, killing a bus driver and several passengers.  He was forcibly displaced from his home, fleeing Sudan, and later lawfully immigrated to the United States. Plaintiff is a U.S. citizen. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members, nightmares, trouble sleeping, feeling distant from his loved ones, feeling as if he does not have a future, trauma, as well as a loss of property and sources of income.

36.    Plaintiff Zainab Babiker Abdelmahmoud Hassan was born in 1985 and resides in Des Moines, Iowa.  While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2006, government soldiers, the security services, and the Janjaweed or pro-government militia attacked Plaintiff's village, Margoba, in North Darfur. The attackers arrived in the morning and entered from the west side of the village.  Plaintiff witnessed gunfire, heavy machine gunfire, burning of homes, beating, kidnapping, starving and torture of civilians as well as stealing and killing of livestock. She witnessed her grandfather sustain injuries in the attack. Plaintiff's home and farm as well as her entire village were destroyed, and she lost her livestock. She was forcibly displaced from her home, fleeing Sudan, and later lawfully immigrated to the United States. Plaintiff is a U.S. lawful permanent resident. As a result of the human rights abuses experienced

in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for her safety, nightmares and anger, as well as a loss of property and sources of income.

37.    Plaintiff Zahara Mohamed Hussein was born in 1995 and resides in Clarkston, Georgia.  While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed.  In 2003, the Janjaweed or pro-government militia attacked Plaintiff's village, Bigbege, in West Darfur. Plaintiff witnessed fighters in military vehicles, gunfire, heavy machine gunfire, burning of homes, raping and detention of civilians. Plaintiff witnessed the killing of her brother.  Her home and farm were destroyed and her livestock was taken. She was forcibly displaced from her home, fleeing Sudan, and later lawfully immigrated to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, malnutrition, depression, anxiety, fear for her safety and the safety of her family members, intrusive thoughts, nightmares, trouble sleeping, feeling distant from her loved ones, anger, reduced ability to work or receive an education, flashbacks, feeling easily startled, loss of interest in activities she used to enjoy and feeling as if she does not have a future, as well as a loss of property and sources of income.

38.    Plaintiff Agok K Garang was born in 1990 and resides in St. Joseph, Missouri. While in Sudan, between November of 1997 and December of 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed.  Government soldiers and the Janjaweed or pro-government militia attacked Plaintiff's village, Bor, in Jonglei.  Plaintiff witnessed shelling from artillery or tanks, gunfire, heavy machine gunfire, use of chemical weapons, burning of homes, beating, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock. Plaintiff's

parents were injured in the attack. Plaintiff's home was burned and his property was destroyed. He was forcibly displaced from his home, fleeing Sudan, and later lawfully immigrated to the United States. Plaintiff is a U.S. citizen.  Plaintiff registered as a refugee with the United Nations High Commissioner for Refugees before coming to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer disease, depression, anxiety, fear for his safety and the safety of his family members, nightmares, trouble sleeping, trauma as a loss of property and sources of income.

39.    Plaintiff Mohieldin Dawed Omer was born in 1975 and resides in Kansas City, Missouri.  While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed.  In 2004, the Janjaweed or pro-government soldiers attacked Plaintiff's village, Tawila, in North Darfur. Plaintiff witnessed fighters on foot, gunfire, heavy machine gunfire, use of chemical weapons, burning of homes, starving, torturing and killing of civilians in detention, as well as stealing and killing of livestock. He was forcibly displaced from his home, feeling Sudan, and later lawfully immigrated to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members, nightmares, trouble sleeping, anger, reduced ability to work or receive an education, difficulty concentrating and feeling as if he does not have a future, as well as a loss of property and sources of income.

40.    Plaintiff Rose Najore Halisto was born in 1985 and resides in Glendale, Arizona. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. She was forcibly displaced from her home, fleeing Sudan, and later lawfully

immigrated to the United States. She is now a U.S. citizen. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, fear for her safety and the safety of her family members, intrusive thoughts, nightmares, feeling distant from her loved ones, reduced ability to receive an education, flashbacks and feeling as if he does not have a future, as well as a loss of property and sources of income.

41.    Plaintiff Nouraldein Abaker Hoss Bakht was born in 1991 and resides in Denver, Colorado. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, Government military, security services, and Janjaweed or pro-government militia attacked Plaintiff's village in Karnoi, North Darfur. Plaintiff witnessed bombing from airplanes or helicopters, shelling from artillery or tanks, fighters on foot, fighters on horses or camels, fighters in military vehicles, gunfire, heavy machine guns on trucks, beatings with hands, sticks, or other objects, burning of homes, execution of prisoners, kidnapping, detention, raping, torturing, beating, starving and killing of civilians, as well as killing and stealing of livestock. Three of Plaintiff's brothers were killed in the attack. Plaintiff was detained for three days by Government military, security services, and Janjaweed or pro-government militia in Wadi Seidna. Plaintiff did not have adequate food, water, and medical care while in detention. While in detention, Plaintiff was tortured, interrogated, asked to make a confession, accused of supporting political opposition, insulted based on race, religion, gender or ethnicity, tied or handcuffed in painful positions, beaten, kicked, severely stricken with objects, burned by fire or hot object, sleep deprived, starved, forced to stand for long periods, and submersed in water. Plaintiff was forcibly displaced from their home, fleeing Sudan and later lawfully immigrated to the United States, where Plaintiff now lives as a U.S. citizen. As a result of the human rights abuses experienced in Sudan and the subsequent forced

displacement, Plaintiff continues to suffer depression, anxiety, fear for their safety, fear for the safety of their family members, intrusive thoughts, nightmares, trouble sleeping, feeling distant from their loved ones, anger, reduced ability to work and to receive an education, difficulty concentrating, flashbacks, feeling easily startled and as if they do not have a future, as well as a loss of property and sources of income.

42.     Plaintiff Mohmoud Ibrahim Abdulrazig was born in 1982 and resides in Denver, Colorado. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers, security services, government police, and Janjaweed or pro-government militia attacked Plaintiff's village in Hashabah, West Darfur. Plaintiff witnessed bombing from airplanes or helicopters, fighters on foot horses or camels and in military vehicles, beatings with hands, sticks or other objects, setting of fires, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock. During the attack, Plaintiff's property was looted and burned. In 2006, Plaintiff was detained for two days in a police station in Al Fashir, North Darfur, by security services, police, and Janjaweed or pro-government militia. While in detention, Plaintiff did not have adequate medical care and was tortured and beat with sticks. Plaintiff was forcibly displaced from his home, fleeing Sudan and later lawfully immigrated to the United States. Plaintiff now lives as a U.S. citizen. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, fear for his safety and the safety of his family members, nightmares, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work or receive education and difficulty concentrating, as well as loss of property and sources of income.

43.    Plaintiff Abdallah Adam Tahir Adam was born in 1984 and resides in Denver, Colorado. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, Janjaweed or pro-government militia attacked Plaintiff's village in Korma, Sudan. Plaintiff witnessed fighters on horses or camels, gunfire, heavy machine guns on trucks, beatings with hands, sticks, or other objects, setting of fires, stealing of livestock, and beating, raping and kidnapping of civilians. Plaintiff was tortured during the attack, suffering a flogging with a whip and insults. He lost livestock and property during the attack as well. Plaintiff was forcibly displaced from his home, fleeing Sudan, and later lawfully immigrated to the United States. Plaintiff now lives as a U.S. citizen. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, feeling jumpy and easily startled, as well as a loss of property and sources of income.

44.    Plaintiff Hamdi Ibrahim Amir was born in 1997 and resides in Sacramento, California. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2005, Janjaweed or pro-government militia attacked Plaintiff's village in Abuzereiga in North Darfur. Plaintiff witnessed bombing from airplanes or helicopters, setting fires and stealing of livestock or pets. During the attack, Plaintiffs' crops were stolen and the village burnt. He was tortured and was wounded in his hand. Plaintiff was forcibly displaced from his home, fled Sudan, and later lawfully immigrated to the United States. Plaintiff is a Muslim. He is a member of the Zaghawa tribe. He fled Sudan because the government was targeting the Zaghawa people. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff

continues to suffer physical injuries, fear for his safety, intrusive thoughts, trouble sleeping, reduced ability to receive education, and feeling as if he does not have a future, as well as a loss of property and sources of income.

45.    Plaintiff Suliman Adam was born in 1978 and resides in Centennial, Colorado. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, the Janjaweed, and/or other pro-government militia. In 2003, Plaintiff was arrested by government military and Janjaweed in Al Fasher. He was detained in an office building for seven days. During that time, Plaintiff was subjected to interrogation, forced confession, burning, beating, forced standing for long periods, hanging from hands or feet, and was forced to witness others being tortured. Plaintiff lost his livestock and livelihood to the government. Plaintiff was forcibly displaced from his home, fled Sudan, and later lawfully immigrated to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, fear for his safety and the safety of others, and feeling as if he does not have a future, as well as a loss of property and sources of income.

46.    Plaintiff Mubarak Yagoub Ibrahim Rahma was born in 1987 and resides in Kent, Washington. While in Sudan, between November 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Janjaweed or pro-government militia attacked Plaintiff near Al Fashir. Plaintiff witnessed gunfire, setting of fires, stealing livestock or pets, as well as starving, raping, and killing of civilians. Plaintiff's car was stolen in the attack. Plaintiff was forcibly displaced from their home, fled Sudan, and later lawfully immigrated to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement,

Plaintiff continues to suffer depression, anxiety, fear for the safety of their family members, reduced ability to work, and feeling as if they do not have a future, as well as a loss of property and sources of income.

47.     Plaintiff Mustafa Mohammed Ali was born in 1992 and resides in Syracuse, New York. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, the Janjaweed, and/or other pro-government militia. In 2003, government soldiers and the Janjaweed attacked Plaintiff's village of Abul-Ushra. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, fighters on horses or camels, military vehicles, gunfire, heavy machine gunfire, use of chemical weapons, burning of homes, use of swords, beating, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock. Plaintiff's grandfather was killed during the attack. Plaintiff's home was looted and burned. He was forcibly displaced from his home, fled Sudan, and later lawfully immigrated to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, memory loss, trouble sleeping, anger, reduced ability to work or receive an education, flashbacks, loss of interest in activities he used to enjoy and feeling as if he does not have a future, as well as a loss of property and sources of income.

48.     Plaintiff Omer Adam Omar was born in 1980 and resides in Brooklyn, New York. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, government soldiers attacked Plaintiff's village in Tarkaneia, North Darfur. Plaintiff witnessed gunfire, heavy machine guns on trucks, stealing of livestock, rape/sexual assault, kidnapping and

detention of civilians, beating, starving, and killing of civilians in detention. Plaintiff was intercepted by the Sudanese army on his way to his village Turkniya (located west of El Fasher), searched and detained for about 10 hours. They found his student identification card and started beating Plaintiff with the butts of their rifles and sticks causing him to bleed. Plaintiff was subjected to torture including being blindfolded and interrogated about his tribe, asked to make a confession, insulted based on race/religion, tied in painful positions, beaten, kicked and hit with objects, beaten on the soles of his feet, burned by lit cigarettes, removal of fingernails, forced to stand for long periods of time and hung from his feet and hands. The soldiers dumped Plaintiff on the side of the road and traveled on to his village to attack, loot, set fires, and kill villagers. When Plaintiff arrived at his village, he found everything burned, his livestock stolen, his father beaten in the head, and found one relative had been killed. Plaintiff recognized the soldiers' flag and uniforms. He was forcibly displaced from his home, fled Sudan, and later lawfully immigrated to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, trouble sleeping, flashbacks, loss of interest in activities he used to enjoy, and feeling as if he does not have a future, as well as a loss of property and sources of income.

49.    Plaintiff Ahmed Ibrahim Yusuf was born in 1982 and resides in Louisville, Kentucky. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, government soldiers and the Janjaweed attacked Plaintiff's village, Tukultukul. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, fighters on foot, fighters on horses or camels, fighters in military vehicles, gunfire, heavy machine guns mounted on trucks, use of swords or

knives, burning of homes, use of chemical weapons, beating, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock. Plaintiff's father and two of his brothers were killed during the attack. His crops were burned and his home was looted and destroyed. His livestock was stolen as well. He was forcibly displaced from his home, fleeing Sudan, and later lawfully immigrated to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer anxiety, fear for his safety and the safety of his family members, nightmares, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to receive an education, flashbacks, feeling easily startled, loss of interest in activities he used to enjoy and feeling as if he does not have a future, as well as a loss of property and sources of income.

50.    Plaintiff Hussien Bashir Haroun Adam was born in 1993 and resides in Buffalo, NY. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003 and subsequent years, government soldiers, security services and the Janjaweed attacked Plaintiff's village in Abohamra. Plaintiff witnessed aerial bombing, fighters on foot, fighters on horses or camels, fighters in military vehicles, gunfire, heavy machine guns on trucks, fighters with swords and knives, fighters beating people with their hands, sticks and other objects, setting fires/burning of homes, stealing and killing of livestock, rapes/sexual assault, detentions of civilians, and beating and killing of civilians in detention. Plaintiff also witnessed the killing of his brother and sister. He was forcibly displaced from his home, fleeing Sudan and later lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, memory loss, trouble sleeping, feeling distant

from his loved ones, anger, flashbacks, loss of interest in activities he used to enjoy and feeling as if he does not have a future, as well as a loss of property and sources of income.

51.    Plaintiff Rashid Hussein Younis Ibrahim was born in 2000 and resides in Brooklyn, New York. While in Sudan, Plaintiff, a Muslim and member of the Zaghawa tribe targeted by the Government of Sudan, was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, 2008 and 2010, Government soldiers, Janjaweed or pro-government militia attacked Plaintiff's village in Marla multiple times. Plaintiff witnessed aerial bombing, gunfire, shelling from artillery or tanks, fighters on horses or camels, heavy machine guns on trucks, setting fires, killing and stealing of livestock, rape or sexual assault of others, and kidnapping of civilians. During the attack, Plaintiff's grandfather was beheaded, Plaintiff's sister was raped by the Janjaweed and the Janjaweed threatened to kill Plaintiff's mother if they spoke. During the attack, the family's home, farm and property were looted and destroyed, and livestock was stolen and the crops burned. Plaintiff was forcibly displaced from his home, fleeing Sudan, and later lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer, depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, trouble sleeping, flashbacks, feeling distant from his loved ones, and feeling as though he does not have a future, as well as a loss of property and sources of income.

52.    Plaintiff Nourdinie Mahamad Yunis was born in 1998 and resides in Schuyler, Nebraska. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government soldiers and the Janjaweed attacked Plaintiff's village, Amashtur, near Nyala in West

Darfur. During the attack, there was shelling from artillery or tanks, fighters on horses or camels, fighters in military vehicles, gunfire, heavy machine guns mounted on trucks, burning of homes, beating and raping of civilians, and stealing and killing of livestock. Plaintiff's older brother was shot and killed. His family's homes were destroyed and livestock was stolen. He was forcibly displaced from his home, fleeing Sudan, and later lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family, nightmares, trouble sleeping, flashbacks, and anger, as well as a loss of property and sources of income.

53.    Plaintiff Gamal Adam Yagoub Hassan was born in 1986 and resides in San Diego, California. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 1998 and 1999, government soldiers, government security services and the Janjaweed attacked Plaintiff's village, Tabarik, as well as the surrounding villages. Plaintiff witnessed aerial bombing, fighters on foot, fighters on horses or camels, fighters in military vehicles, gunfire, heavy machine guns mounted on trucks, burning of homes, beating, raping, kidnapping and killing of civilians, as well as stealing of livestock. During the attack, two of Plaintiff's cousins were killed. His home and property were burned and destroyed, and his livestock were stolen as well. He was forcibly displaced from his home, fleeing Sudan, and later lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, depression, anxiety, fear for his safety, intrusive thoughts, nightmares, trouble sleeping, feeling distant from his loved ones, anger,

difficulty concentrating, flashbacks, a loss of interest in activities he used to enjoy and feeling as if he does not have a future, as well as a loss of property and sources of income.

54.    Plaintiff Madibo Adam Hassabllah Madibo was born in 1994 and resides in Denver, Colorado. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2005, government soldiers and the Janjaweed attacked Plaintiff's village in El Fasher. Plaintiff witnessed aerial bombing, fighters on foot, fighters on horses or camels, fighters in military vehicles, gunfire, machine guns mounted on trucks, use of swords or knives, burning of homes, beating, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock. Plaintiff's sister was raped and his father went missing and is still missing. His home was burned and destroyed and his livestock was stolen. In 2009, civilian police detained Plaintiff for two days in a ghost house in El Fasher. During this detention, Plaintiff was subjected to interrogation, forced confessions, accusation of supporting the political opposition, insults based on race, religion, gender or ethnicity, beatings on the soles of his feet or hands, electrical shock, nail removal, blindfolding, threats to loved ones, mock execution, and starvation. He was forcibly displaced from his home, fleeing Sudan, and later lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members, nightmares, trouble sleeping, flashbacks, anger, sadness, and feeling easily startled, as well as a loss of property and sources of income.

55.    Plaintiff Salaheldin Idris Younis Senien was born in 1991 and resides in Denver, Colorado. While in Sudan, Plaintiff, a Muslim and member of the Zaghawa tribe targeted by the Government of Sudan, was subjected to human rights abuses at the hands of those funded by

BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2006, the Janjaweed attacked Plaintiff's village, Gosbeda. Plaintiff witnessed shelling from artillery or tanks, fighters on foot, fighters on horses or camels, fighters in military vehicles, gunfire, heavy machine guns mounted on trucks, use of swords or knives, burning of homes, use of chemical weapons, beating, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock. Plaintiff sustained injuries to his shoulder during the attack. Plaintiff's uncle was killed in the attack as well. His home was burned, and his livestock was stolen as well. Plaintiff was forcibly displaced from his home, fleeing Sudan, and later lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, depression, anxiety, fear for his safety and the safety of his family members, intrusive thoughts, nightmares, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work or receive an education, difficulty concentrating, flashbacks, feeling easily startled, loss of interest in activities he used to enjoy and feeling as if he does not have a future, as well as a loss of property and sources of income.

56.     Plaintiff Amer Mohammed Bakht Menawy was born in 1990 and resides in Denver, Colorado. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2004, government soldiers and the Janjaweed attacked Plaintiff's village, Tawela. Plaintiff witnessed aerial bombing, fighters on horses or camels, fighters in military vehicles, gunfire, heavy machine guns mounted on trucks, burning of homes, use of chemical weapons, raping and killing of civilians, as well as stealing and killing of civilians. In 2007, members of the government military and Janjaweed detained Plaintiff for four months in a military prison. During this detention, Plaintiff was subjected to interrogation, forced confession, insults based on race, religion, gender

or ethnicity, being tied in painful positions, beatings, beatings on the soles of his feet or his hands, stabbings, nail removal, blindfolding, starvation, forced standing for long periods, hanging by his hands or feet, mock execution, threats to his loved ones, being tied to others, witnessing others being tortured, exposure to extreme temperatures and suffocation. Plaintiff's brother and sister were killed during the attack. Plaintiff's home was burned and his livestock was stolen as well. He was forcibly displaced from his home, internally displaced, fled Sudan, and later lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical injuries, disease, depression, anxiety, fear for his safety and the safety of his family members, nightmares, trouble sleeping, feeling distant from his loved ones, anger, reduced ability to work or receive an education, difficulty concentrating, feeling easily startled, loss of interest in activities he used to enjoy and feeling as if he does not have a future, as well as a loss of property and sources of income.

57.    Plaintiff Adam A Ibrahim was born in 1993 and resides in West Valley City, Utah. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

58.    Plaintiff Nyanthiec Jam Awel was born in 1986 and resides in Pittsburgh, Pennsylvania. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers,

security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

59.    Plaintiff Noraldiem Ahmed Ismail was born in 1988 and resides in San Diego, California. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

60.    Plaintiff Lado Yanga Jurkin was born in 1977 and resides in Denver, CO. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

61.    Plaintiff Muna Yaqoub Mohamed was born in 1996 and resides in Laveen, Arizona. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and

the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

62.    Plaintiff Ahmed Abdulrasoul Mohammed Matar was born in 2000 and resides in Kent, Washington. While in Sudan, between 2000 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

63.    Plaintiff Bahareldin Mohammad Omer Abdalla was born in 1999 and resides in Bellevue, Nebraska. While in Sudan, between 1999 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

64.    Plaintiff Abdu Norain Mohamed was born in 1987 and resides in Rancho Cordova, California. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

65. Plaintiff Muotasim Musa Alsafi was born in 1991 and resides in Kent, Washington. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

66. Plaintiff Mahsim Abakar Ismail resides in Huber Heights, Ohio. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

67. Plaintiff Mohamed H Khater was born in 1998 and resides in Fort Morgan, Colorado. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2005, government soldiers and the Janjaweed attacked Plaintiff's village in Labdo. Plaintiff witnessed aerial bombing, shelling from artillery or tanks, gunfire, heavy machine guns mounted on trucks, burning of homes, raping, kidnapping and killing of civilians, as well as stealing and killing of livestock. Plaintiff's grandfather and two of his uncles were killed during the attack. His livestock was stolen as well. Plaintiff was forcibly displaced from his home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and

the subsequent forced displacement, Plaintiff continues to suffer fear for the safety of his family members, as well as a loss of property and sources of income.

68.    Plaintiff Auar Ibrahim Yahya resides in Twin Falls, Idaho. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

69.    Plaintiff Khaled Osman resides in Hartford, Connecticut. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from his home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

70.    Plaintiff Yonies Hassan resides in Westminster, California. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

71.     Plaintiff Abdallah Ali Elnour was born in 1981 and resides in Naperville, Illinois. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from his home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

72.     Plaintiff Jur Kucha resides in Rochester, Minnesota. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional, and psychological injuries, as well as a loss of property and sources of income.

73.     Plaintiff Mohammed Ibrahim resides in Fort Worth, Texas. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

74.     Plaintiff Hanan Musa Tagal was born in 1982 and resides in Denver, Colorado. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights

abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

75.    Plaintiff Abdalkarim Adam Mohammed Izzaldin was born in 1992 and resides in Silvis, Illinois. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

76.    Plaintiff Kamal Ahmad Mahmoud was born in 1987 and resides in Aurora, Colorado. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

77.    Plaintiff Mary Abiech Akoon was born in 1986 and resides in University Place, Washington. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from her home, fleeing

Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

78.    Plaintiff Arbab Ismail Ibrahim was born in 1989 and resides in Greensboro, North Carolina. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

79.    Plaintiff Mohamed Adam Mohamed Juma resides in Denver, Colorado. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from his home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

80.    Plaintiff Musab Arbab resides in Bennett, Colorado. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced

displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

81.     Plaintiff Zahara Yekisuk resides in Kansas City, Missouri. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

82.     Plaintiff Mahamad Ismail Ibrahim resides in Greensboro, North Carolina. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

83.     Plaintiff Abdelkarim Adam Adam Ahmed Musa was born in 1975 and resides in Des Moines, Iowa. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from his home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

84.     Plaintiff Adam Ibrahim Ismail was born in 1979 and resides in Salt Lake City, Utah. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from his home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

85.     Plaintiff Monica Aluel Ayuen resides in Maricopa, Arizona. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from her home, fleeing Sudan and lawfully immigrating to the United States.. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

86.     Plaintiff Mohammed Mahmoud Wara was born in 1989 and resides in Denver, Colorado. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from his home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

87.     Plaintiff Eman Ali resides in Iowa City, Iowa. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by

BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

88.     Plaintiff Abobaker S Ibrahim resides in Grand Rapids, Michigan. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from his home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

89.     Plaintiff Younes Omar Adam resides in Denver, Colorado. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

90.     Plaintiff Atia Kafi Kujur was born in 1962 and resides in San Diego, California. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully

immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

91.     Plaintiff Abualgesem A Abdalmoula was born in 1965 and resides in Phoenix, Arizona. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from his home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

92.     Plaintiff Ibrahim Ahmed Ali was born in 1975 and resides in Iowa City, Iowa. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from his home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

93.     Plaintiff Abbakar El Sonosi Mohamed was born in 1961 and resides in South Portland, ME. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from his home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses

experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

94.     Plaintiff John Malwal was born in 1963 and resides in Fargo, ND. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from his home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

95.     While Plaintiff Mohamed O Fadhl resided in Sudan, between November of 1997 and 2011, he was subjected to human rights abuses at the hands of those funded by BNPP— Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from his home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

96.     Plaintiff Yassien Daleel resides in Denver, Colorado. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

97.     Plaintiff Mary Dawod L. Lako resides in Kansas City, Missouri. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from her home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

98.     Plaintiff Aman Gai Garang Deng resides in Rochester, Minnesota. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

99.     Plaintiff Amna Korashy resides in Houston, Texas. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from her home, fleeing Sudan and lawfully immigrating to the United States.. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

100.    Plaintiff Ekalino M Awour Kur was born in 1954 and resides in Rock Island, Alaska. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human

rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

101.    Plaintiff Mahmoud Abdalla Adam Abdalla was born in 1991 and resides in Carlisle, Pennsylvania. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from his home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer fear for his safety and feeling as if he does not have a future, as well as a loss of property and sources of income.

102.    Plaintiff Hafiz Abdulkarim Wadi was born in 1972 and resides in El Cajon, California. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, government agents attacked Plaintiff's city of Al Fashir. During the attack, Plaintiff witnessed aerial bombing, gunfire and the raping and killing of civilians. Plaintiff injured his ankle in the attack. His home was destroyed and livestock stolen as well. Plaintiff was forcibly displaced from his home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, as well as a loss of property and sources of income.

103.     Plaintiff Samual Musa Abdalgadir resides in San Diego, California. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP— Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2003, Janjaweed or pro-government militia attacked Plaintiff's village in Darfur. Plaintiff witnessed setting of fires, killing of livestock, rape or sexual assault of others, as well as detention, starving, raping, and killing of civilians. Plaintiff's older sister was tortured, and her leg was broken. The property of Plaintiff's family was looted and burned. Plaintiff was injured when fleeing from the attack to a neighboring village. He was arrested and detained for three days by Janjaweed or pro-government militia in a house or office building. While in detention, Plaintiff did not receive adequate food or water and did not receive adequate medical care. Plaintiff was tortured, subjected to interrogation, insults based on race, religion, gender, or ethnicity, beating, kicking and electrical shock. Plaintiff was forcibly displaced from their home, fleeing Sudan, and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer disease, malnutrition, depression, anxiety, fear for their safety and the safety of their family members, intrusive thoughts, nightmares, trouble sleeping, and feeling distant from their loved ones, as well as a loss of property and sources of income.

104.     Plaintiff Mubarak Suliman Rahma resides in Fort Wayne, Indiana. While in Sudan, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP— Government of Sudan soldiers, security forces, and/or the Janjaweed. In 2005, Janjaweed or pro-government militia attacked Plaintiff's village in Um Hashab and Katul, North Darfur. Plaintiff witnessed bombing from airplanes or helicopters, fighters on foot, on horse or camel, and in military vehicles, beating with hands, sticks, or other objects, setting of fires, killing and stealing of livestock, rape or sexual assault or others, as well as detention and raping of civilians. Plaintiff's

uncle was injured in the attack and Plaintiff's property and livestock was stolen and destroyed. Plaintiff was forcibly displaced from his home, fleeing Sudan, and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer depression, anxiety, fear for his safety and the safety of his family members, nightmares and difficulty concentrating, as well as a loss of property and sources of income.

105.    Plaintiff Yasmeen Musa Abelgadir was born in 1988 and resides in San Diego, California. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from her home, fleeing Sudan, and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

106.    Plaintiff Abdulrazik Mahdi resides in Fort Worth, Texas. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

107.    Plaintiff Abdelkarim Osman Hassan was born in 1976 and resides in Portland, Maine. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security

forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

108.    Plaintiff Babiker Abdalla Haroun Abdalla resides in Henrico, Virginia. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

109.    Plaintiff Abdallah Ishag resides in Fruitland, Idaho. While in Sudan, between November of 1997 and 2011, Plaintiff was subjected to human rights abuses at the hands of those funded by BNPP—Government of Sudan soldiers, security forces, and/or the Janjaweed. Plaintiff was forcibly displaced from their home, fleeing Sudan and lawfully immigrating to the United States. As a result of the human rights abuses experienced in Sudan and the subsequent forced displacement, Plaintiff continues to suffer physical, emotional and psychological injuries, as well as a loss of property and sources of income.

110.    BNPP's actions were a substantial factor in causing the foreseeable harm described above to each of the Plaintiffs.

**B.    Defendants**

111.    Defendant BNP Paribas, S.A. is a global financial institution headquartered in Paris, France.  BNP Paribas, S.A. came into existence in May 2000 as the result of a merger of Banque

Nationale de Paris S.A. and Banque de Paris et des Pays-Bas S.A.[8]  BNPPSA is the ultimate parent of its U.S. branch office and has its U.S. headquarters located at The Equitable Tower, 787 Seventh Avenue, New York, New York 10019.  BNPPSA is also the parent of its subsidiary, BNPP Geneva (BNP Paribas (Suisse) S.A.), located in Geneva, Switzerland ("BNPP Geneva").  BNPPSA pled guilty for U.S. Sanctions violations and criminal conduct committed by its subsidiaries, including BNPP Geneva and BNPPNY.

112.    Defendant BNP Paribas US Wholesale Holdings, Corp. (f/k/a BNP Paribas North America, Inc.) ("BNPPNA") is a U.S. subsidiary of BNPPSA.  It is incorporated in Delaware and registered to do business in New York as a foreign business corporation.  Its offices are located at 787 Seventh Avenue, New York, New York, 10019.

113.    Plaintiffs are informed and believe and thereon allege that at all times herein mentioned each Defendant sued herein was the agent, alter ego, subsidiary, and/or employee of each of the remaining Defendants and at all times was acting within the purpose and scope of such agency, alter ego, subsidiary relationship, or employment, with the permission and consent of their Co-Defendants and with the knowledge, authorization, permission, and consent and/or subsequent ratification and approval of each Co-Defendant.

## III.    JURISDICTION AND VENUE

114.    This Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) because the matter in controversy as to each Plaintiff exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States, citizens of a State and

---

[8] Each of the two parent banks descended from four founding banks:  BNP resulted from the 1966 merger of two French banks, Banque Nationale Pour le Commerce et l'Industrie ("BNCI"), and Comptoir National d'Escompte de Paris ("CNEP"); Paribas was formed in 1872 from two investment banks based in Paris and Amsterdam.

citizens or subjects of a foreign state, or citizens of different States and citizens or subjects of a

foreign state are additional parties.

115.    This Court has personal jurisdiction over BNPPSA because BNPPSA, *inter alia*,

purposefully availed itself of the New York forum and transacted business in New York under

CPLR § 302(a)(1) by deliberately processing thousands of financial transactions in U.S. dollars,

from and through the New York financial system, beginning in 1997 through 2007, which it knew

were in violation of U.S. Sanctions and New York law.  BNPPSA also knew that its actions would

cause foreseeable harm to the Plaintiffs.   Personal jurisdiction is also proper under CPLR

§ 302(a)(2) because BNPPSA committed these tortious acts within the state as alleged herein.

These acts were confirmed by BNPPSA's admitted crimes in this district in the criminal

prosecutions by the United States and the DANY.  Indeed, both this Court and the New York State

Supreme Court exercised jurisdiction over BNPPSA when BNPPSA pled guilty.

116.    This Court has personal jurisdiction over BNPPNA, *inter alia*, because its principal

place of business is located in this state at 787 Seventh Avenue, New York, New York, 10019.

BNPPNA transacts business in New York as defined by CPLR § 302(a) in that its New York office

was used as part of BNPP's scheme to conduct thousands of financial transactions in, from, and

through New York beginning in 1997 through 2007.  Personal jurisdiction is also proper under

CPLR § 302(a)(2) because BNPPNA committed tortious acts within the state as alleged herein.

117.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a) and (b)(1), (2), and

(3).  First, BNPPSA is a resident under (c)(2) because it is subject to the Court's personal

jurisdiction with respect to the civil action in question.

118.    Second, venue is proper under (b)(2) because "a substantial part of the events or

omissions giving rise to the claim occurred, or a substantial part of property that is the subject of

the action is situated" occurred in this judicial district.  Here, a substantial part of the events or omissions that gave rise to the claims occurred within New York and this district, including the criminal investigations, charges, and convictions.  As the United States' global financial center, New York was inextricably linked to BNPP's criminal conduct, which in turn, essential for the GOS to have the resources to perpetrate its campaign of violence against Plaintiffs.  Although dollar-denominated transactions can clear elsewhere in the United States, the New York City-based Clearing House Interbank Payments System ("CHIPS") handles approximately 95% of all cross-border U.S. dollar payments.  Thus, without New York, the global locus for financial clearinghouse services for petrodollars, BNPP would not have been able to provide access to U.S. dollars and the U.S. financial system that the GOS needed to circumvent the U.S. Sanctions.  Further, BNPP cleared transactions in New York, thereby placing the funds at issue here in New York, yielding another basis for venue.

119.    The fact that the DANY investigated, charged, and convicted BNPP for falsifying business records demonstrates that BNPP committed illegal actions in New York and under New York state law, *e.g.*, "cooking" its records to cover up its violations of the U.S. Sanctions and/or formulating its intent to do the same, in New York.  Importantly, this criminal charge was not limited to the period in which BNPP used its New York Branch to process the illicit transactions.  The charges included the time period after 2004 in which BNPP used a third-party correspondent bank to process transactions in New York on Sudan's behalf.

120.    The fact that venue is proper here is confirmed by the fact that New York State law regulated BNPP's conduct, and New York state-based prosecutors and agencies, including the DANY, the DFS, the U.S. Attorney for the Southern District of New York, and the FRB-NY, exercised investigatory and regulatory authority over BNPP.

121.    Further, the Southern District is the proper forum because much of the evidence relevant to proving Plaintiffs' causes of action is already in New York.  During the investigations by multiple government agencies in New York, the agencies collected extensive information from BNPP, much of which demonstrates BNPP's liability.  Further, BNPPNY and the third party correspondent bank that BNPP also used to process financial transactions in New York, key components of the criminal conduct that is the subject of this suit and the above-mentioned investigations, are located in New York.

### IV.    FACTUAL BACKGROUND

**A.    The Government of Sudan Sought to Exploit Its Oil Resources to Maintain Power and Fund a Campaign of Mass Atrocities**

**1.    The al-Bashir Regime**

122.    Sudan was, until the July 2011 secession of South Sudan, Africa's largest country, but despite being endowed with a wide variety of natural resources, it remains one of the poorest countries in the world.  It has been torn by civil strife since achieving independence in 1956, with a multitude of violent, interlocking conflicts in Western, Central, Eastern, and Southern Sudan. The root cause of the decades of catastrophic violence is the continued dominance of certain groups from Khartoum and the surrounding Nile Valley.  To maintain its position of wealth and power, these riverine elite followed a strategy of divide and rule.  In the process, the elite have used religion, ethnicity, and language to divide and oppress disfavored groups, and have left the vast majority of the Sudanese in dismal poverty.

123.    This long history of oppression and division entered one of its darkest chapters in June 1989, when a cabal of Islamist politicians and military officers took power in a coup against a democratically elected government.  The coup installed Omar Hassan al-Bashir as head of the Revolutionary Command Council for National Salvation, the authority by which the junta

exercised control.  Under the reign of al-Bashir and his allies, the GOS conducted a bloody and ever-intensifying campaign of violence against those in the south, east, and west of the country who might stand in the way of its efforts to consolidate power and expand oil exploration and revenue, including those disfavored civilians living in oil rich regions.

124.    Notably, even in the early 1990s, the human rights violations by the al-Bashir regime were internationally reported.  For example, in 1990, Africa Watch, a prominent African NGO, released one of the first major independent accounts of the crisis in the country, "Sudan, a Human Rights Disaster," which garnered substantial international media attention.[9]  In 1993, the U.S. designated Sudan as a state sponsor of terrorism, a designation that it still has.  And, in 1996, Human Rights Watch published a book-length report, "Behind the Red Line: Political Repression in Sudan," describing the violently coercive control the GOS imposed to discipline and punish its own citizens.  That report generated considerable international attention.[10]

### 2.    Sudan's 1997 Entry Into International Oil Markets

125.    The GOS, as part of its efforts to consolidate power and enrich itself, sought to develop Sudan's oil resources.  Although major oil deposits were discovered in southern Sudan beginning in 1979, efforts to exploit them, through concessions to foreign operators, had been frustrated by the on-going civil war, especially in the period following 1983, known as the Second Civil War.

---

[9] *See, e.g.*, Neil Henry, Life in Impoverished Sudan Grows Harder after Failed Coup, Wash. Post, May 24, 1990, at A45; Famine 'Used as Weapon', Guardian, Mar. 19, 1990; Michael A. Hiltzik, Sudan Accused of 'Brutal Repression' of Opposition: Human Rights: Hundreds were Jailed, Tortured or Hanged, the Africa Watch Group Reports, L.A. Times, Mar. 15, 1990.

[10] Human Rights Watch, Sudan: Rights Group Calls on Sudan to Open Secret Trials, Africa News, Sept. 13, 1996; Sudan: Slavery and War Abuses Continue, Rights Group Says, Inter Press Service, May 29, 1996; Abed Jaber, Rights Groups Accuses Sudan of Abuses, United Press Int'l, May 28, 1996.

126.    Beginning in 1995, the GOS looked to jump-start its oil production to obtain much needed revenue.  Given the lack of domestic know-how, the GOS needed to attract foreign partners with the technical ability to drill and export the oil.  To this end, al-Bashir visited China in 1995.  There, he signed an agreement with the China National Petroleum Corporation ("CNPC") to develop an oil rich region called Block Six, which is in the Muglad Basin in the Kordofan and Abyei regions.[11]  Two years later, CNPC and its partners, including Arakis Energy Corporation, a Canadian company that was taken over by Talisman Energy, Inc. ("Talisman") in 1998, formed a joint operating company, known as the Greater Nile Petroleum Operating Company ("GNPOC") to develop Blocks One, Two, and Four.

127.    By 1997, Sudan's effort to develop its oil reserves were well underway and it began planning to begin exporting oil.  This represented an auspicious opportunity for the regime to tap into new sources of funding for the military, but also to reward its key constituencies who had supported the military-Islamist government.  Thus, from the onset, the regime saw politics and the economy as mutually constitutive:  Political power was to be buttressed and expanded through the military and through wealth accumulation for new elites fiercely loyal to the new order, and, conversely, political networks were put at the service of enriching those deemed to deserve it for their support of the regime.

---

[11] Sudan's oil fields are divided into a series of "blocks," each of which has been allocated to a different concessionaire.  Sudan awarded many of these blocks to foreign concessionaries to develop.

3. **To Capitalize on Oil Exports, the GOS Needed Access to "Petrodollars," Which BNPP Agreed to Provide**

128.    The GOS, like other oil exporters, sought to market and sell its oil globally.  In 1997, as now, that meant selling its oil for U.S. dollars, a/k/a "petrodollars," because that would maximize the revenues from its oil and give it U.S. dollars with which to import goods.

129.    Oil transactions on the global market are priced and settled in U.S. dollars.  This is so for many reasons:  As the global reserve currency, the dollar is considered uniquely stable and easily convertible, unlike the currencies of many other countries with a large presence in the oil trade; the bulk of international trade is priced and transacted in U.S. dollars; over half of the world's central banks' foreign currency reserves are held in dollars; the United States has historically been a major buyer and seller in the global oil market; and the OPEC countries, which account for the bulk of global oil exports, price their oil in U.S. dollars.

130.    For the GOS, like other oil exporters, to sell oil in dollars meant that it needed access to the U.S. financial system.  Because of the structure and organization of global financial markets, transactions settled in dollars must be processed through the U.S. financial system in the United States.  As mentioned above, the New York City-based CHIPS handles approximately 95% of all cross-border U.S. dollar payments.  Payments flow through CHIPS even if both the payer and recipient are based outside of the United States.[12]  Foreign banks settle U.S. dollar transactions either through a United States-based subsidiary or a correspondent bank based in the United States.[13]

---

[12] See Barry E. Carter & Ryan Farha, Overview and Operation of U.S. Financial Sanctions, Including the Example of Iran, 44 Geo. J. Int'l L. 903-913 (2013).

[13] A correspondent bank is a financial institution that provides services on behalf of another financial institution, including wire transfers, business transactions, and accepting deposits.

131.    The GOS's alternatives to selling oil in U.S. dollars were significantly less advantageous, a fact confirmed by the experience of other oil producers like Iraq and Iran that suffered under U.S. Sanctions.  Without access to dollars via the U.S. financial system, the GOS would either have had to (*i*) barter its oil in exchange for other goods or services, or (*ii*) accept other currencies, both of which have significant drawbacks.

132.    Bartering limits potential counterparties to those that have something the oil producer wants and who, in turn, want oil.  Russia and China, two of the GOS's main weapons suppliers, are the second and fifth largest global oil producers and therefore are unlikely barter partners for Sudan's oil.  Bartering also requires shipping oil to the counterparty, which can be an expensive or difficult proposition.  Similarly, using an alternative currency is generally financially disadvantageous.  Currencies other than the U.S. dollar are less stable and less convertible, and therefore they increase transaction costs due to risk discounts and currency arbitrage.

133.    Access to letters of credit from reputable, internationally known banks such as BNPP, including letters of credit denominated in U.S. dollars, was also crucial to the GOS's ability to monetize its oil from and after the late 1990s, both for its exports and imports.

134.    Letters of credit are an essential part of trade finance, where payment for imported goods is not made at the time of delivery (typically, it is made thirty days after).  In international trade, assessing the creditworthiness of counterparties in different countries is difficult, and seeking and obtaining compensation for contractual nonperformance is expensive, time-consuming, and problematic.  Letters of credit are designed to address these issues.  A letter of credit is a commitment to pay by the issuing bank, enabling a seller to substitute the bank's creditworthiness for that of the buyer, and it is used when the transaction value is sizeable.  For

example, a single cargo of crude oil could be worth $20 million to $75 million, depending on the price of oil. A letter of credit guaranteed payment in the case of buyer non-performance.

135. In addition, when buyers incur costs in purchasing goods (*e.g.*, in chartering a tanker to pick up a cargo of crude oil), or are concerned that sellers may not make delivery on previously agreed pricing terms (*e.g.*, when markets are volatile), sellers may need to post a performance bond, which are often in the form of a letter of credit.

136. Thus, by 1997, the GOS needed and sought out a banking partner such as BNPP that would be able to settle oil transactions in the U.S. and to provide it with U.S. dollar denominated letters of credit to maximize its exploitation of its oil resources. The GOS also needed a banking partner willing to violate U.S. Sanctions against prohibiting those very services due to the likely impact on civilian populations.

## B.    U.S. Sanctions Implemented U.S. Policy Opposing the Government of Sudan's Persecution of Disfavored Sudanese Civilians and the Use of Oil Income to Finance Such Persecution

137. Just as the GOS was entering the global market for oil and in need of access to the U.S. financial system, the United States implemented and increased its Sanctions on Sudan. The United States did so, in part, because of the atrocities being committed by the GOS and the fact that oil revenues would undoubtedly boost the GOS's ability to continue them. The critical role of the U.S financial system in international trade, including the oil industry, were well known in the 1990s, and, when it exercised its sanctions power, the United States did so knowing that a country cut off from access to it would suffer economically. They were not paper tigers. The sanctions were intended and expected to have a material impact on the GOS.

*****

138.    Congress and the Executive Branch recognized the Sudanese people's suffering at the hands of the GOS, their own government, and took action to try to end these atrocities by imposing economic sanctions on Sudan and those that would do business with the GOS.

139.    A 1992 concurrent resolution in the House of Representations and the Senate "condemn[ed] the egregious human rights abuses by the [GOS] and call[ed] upon [it] to cease its abuses of internationally recognized human rights."[14]  Congress admonished the GOS for its "imprisonment, torture, and execution of suspected dissidents across the country," "cruel campaign to relocate some 500,000 internally displaced southerners and westerners from the outskirts of Khartoum to inhospitable camps far from the city," and "campaign of forced displacement of tens of thousands of Nuba from their ancestral homes in southern Kordofan Province, the destruction of Nuba villages, and the killing of hundreds of civilians."[15]

140.    In 1993, the U.S designated Sudan as a state sponsor of terrorism, a designation that it still has today.

141.    In 1995, a U.S. State Department report to Congress principally attributed Sudan's on-going internal havoc to the GOS's campaign of massive human rights abuses.[16]

142.    As the violence persisted and as Sudan was working to exploit its oil resources and begin exporting oil, President Bill Clinton issued Executive Order 13067 on November 3, 1997 ("E.O. 13067"), pursuant to authority granted by, *inter alia*, the IEEPA.[17]

---

[14] S. Con. Res. 140, 102 Cong., 106 Stat. 5207 (Oct. 6, 1992).

[15] *Id*.

[16] U.S. Department of State Dispatch, U.S. Policy Toward Sudan, Statement by Edward Brynn, Acting Assistant Secretary for African Affairs, before the Subcommittee on Africa, House, International Relations Committee (Mar. 22, 1995).

[17] Codified at 50 U.S.C. 1701 *et seq*.

143.    E.O. 13067 was designed to cut off the GOS from the U.S. financial system to deprive the GOS of access to the dollars that it needed to fund its human rights violations.  E.O. 13067 imposed broad economic sanctions that froze GOS assets in the United States and prohibited broad categories of transactions by any individual or entity in the United States with the GOS, its agencies, instrumentalities, and controlled entities, including the Central Bank of Sudan.  The 1997 sanctions covered the import and export of goods, technology, and services, including brokerage, lending, and financing services.[18]  The sanctions did so because "the policies and actions of the [GOS], including continued support for international terrorism; ongoing efforts to destabilize neighboring governments; ***and the prevalence of human rights violations, including slavery and the denial of religious freedom***, constitute an unusual and extraordinary threat to the national security and foreign policy of the United States." (emphasis added)[19]

144.    The 2002 Sudan Peace Act recognized the continuing grave situation on the ground: "The acts of the [GOS] . . . constitute genocide as defined by the Convention on the Prevention and Punishment of the Crime of Genocide."[20]  Congress found that the GOS: (*i*) "intensified its prosecution of the war against areas outside of its control, which has already cost more than 2,000,000 lives and has displaced more than 4,000,000 people;" (*ii*) "used divide-and-conquer techniques effectively to subjugate its population;" and (*iii*) "utilize[d] and organize[d] militias, Popular Defense Forces, and other irregular units for raiding and enslaving parties in areas outside of [its] control . . . in an effort to disrupt severely the ability of the populations in those areas to

---

[18] Exec. Order No. 13067, 62 Fed. Reg. 59989 (Nov. 3, 1997), reprinted in 31 C.F.R. 538 (62 Fed. Reg. 59989, November 5, 1997).

[19] *Id.*

[20] The Sudan Peace Act, Pub. L. 107-245 at § 2(10), 116 Stat. 1504 (2002) (codified at 50 U.S.C. § 1701 note).

sustain themselves."[21]   The Act singled out the GOS's "use of raiding and slaving parties [as] a tool for creating food shortages and [ ] as a systematic means to destroy the societies, culture, and economies of the Dinka, Nuer, and Nuba peoples. . . ."[22]

145.    The Peace Act required the President, after consultations with Congress, to implement further sanctions if the President concluded that the GOS was not making a good faith effort to end the on-going civil war and its human rights abuses.[23]   The Act focused specifically on the direct relationship between GOS's abuses and its access to oil revenues, finding that the GOS "*has repeatedly stated that it intends to use the expected proceeds from future oil sales to increase the tempo and lethality of the war against the areas outside of its control.*"[24] (emphasis added).   To that end, the Act instructed the President to "take all necessary and appropriate steps . . . to deny the [GOS] access to oil revenues to ensure that the [GOS] neither directly nor indirectly utilizes any oil revenues to purchase or acquire military equipment or to finance any military activities."[25]

146.    Forerunning the explicit terms of the Peace Act itself, the Congressional debate on the Peace Act focused repeatedly on the link, recognized at that time, between the GOS's human rights abuses and its oil sales, further evidencing Congress's desire to protect the victimized Sudanese people when it enacted the Sudan Peace Act:

- "The Sudanese Government *has increased oil mining in areas inhabited by the southern Sudanese, thereby forcibly displacing the people to finance a more lethal and offensive war.*   I would point out to my colleagues that *oil has been facilitating this war, and we have got to be*

---

[21] Pub. L. 107-245 § 2(1)-(7).

[22] *Id*. at § 4(2).

[23] *Id*. at § 6(b).

[24] *Id*. at § 2(8).

[25] *Id*. at § 6(b)(2)(C).

> *very clear that any way that we help or enable the production of oil in the Sudan means that more innocent people will lose their lives.*"[26]

- "***And for the first time, there will be a link made officially between the genocide and the slaughter in Sudan and oil money.*** [27]

- "[T]he bill before us today makes **the express link between oil and the Government of Sudan's intention to use future revenues to expand the war into areas beyond its control.**"[28]

147.    The 2004 Comprehensive Peace in Sudan Act[29] broadened the concerns of the 2002 Act to include the Darfur region,[30] because "both the executive branch and Congress [ ] concluded that genocide has been committed and may still be occurring in the Darfur region, and that the [GOS] and militias supported by the [GOS], known as the Janjaweed, bear responsibility for the genocide."[31]    Congress again recognized the role of oil in fueling the conflict and required the Secretary of State to submit to it a report describing the "***current status of Sudan's financing and construction of infrastructure and pipelines for oil exploitation, the effects of such financing and construction on the inhabitants of the regions in which the oil fields are located and the ability of the [GOS] to finance the war in Sudan with the proceeds of the oil exploitation.***"[32]

148.    President George W. Bush issued E.O. 13400 on April 26, 2006 ("E.O. 13400"),[33] which expanded the scope of E.O. 13067 to block property and property interests of certain persons

---

[26] Statement of Representative Chris Smith, 107 Cong. Rec. H7105 (Daily ed. Oct. 7, 2002) (emphasis added).

[27] Statement of Representative Bachus, *Id.* at H7108 (emphasis added).

[28] Statement of Representative Eddie Bernice Johnson , *Id.* at H7109 (emphasis added).

[29] Comprehensive Peace in Sudan Act of 2004, Pub. L. 108-497, 118 Stat. 4012 (2004).

[30] Pub. L. 108-497 § 4(a).

[31] Pub. L. 108-497 § 3(6).

[32] *Id.* at §8(a)(1) (emphasis added).

[33] Exec. Order No. 13400, 71 Fed. Reg. 25483 (Apr. 26, 2006).

connected to the conflict in Darfur.  E.O. 13400 was in response to "the persistence of violence in Sudan's Darfur region, particularly against civilians and including sexual violence against women and girls, and by the deterioration of the security situation and its negative impact on humanitarian assistance efforts. . . ."

149.    On October 13, 2006, President Bush signed the Darfur Peace and Accountability Act.[34]  Congress found that "the genocide unfolding in the Darfur region of Sudan is characterized by acts of terrorism and atrocities directed against civilians, including mass murder, rape, and sexual violence committed by the Janjaweed and associated militias with the complicity and support of the National Congress Party-led faction of the Government of Sudan."[35]  The Act required that the 1997 sanctions "remain[ed] in effect, and shall not be lifted . . . until the President certifies to the appropriate congressional committees that the [GOS] is acting in good faith to," among other things, "implement the Darfur Peace Agreement," "disarm, demobilize, and demilitarize the Janjaweed and all militias allied with the Government of Sudan," "fully implement the Comprehensive Peace Agreement for Sudan without manipulation or delay," and "withdraw[] government forces from Southern Sudan consistent with the terms of the Comprehensive Peace Agreement for Sudan."[36]

150.    Days later, President Bush issued Executive Order 13412 ("E.O. 13412"), imposing additional sanctions aimed specifically at the GOS's ability to fuel genocide with oil.  It prohibited

---

[34] Darfur Peace and Accountability Act of 2006, Pub. L. 109-344, 50 U.S.C. § 1701 (2016).

[35] *Id.* at § 4(1).

[36] Pub. L. 109-344 § 7(a).

"**all transactions by United States persons relating to the petroleum or petrochemical industries in Sudan**, including, but not limited to, oilfield services and oil or gas pipelines. . . ."[37]

151.    As summarized in a 2007 State Department statement of "overall policy": the "United States has imposed economic sanctions on Sudanese individuals and companies owned or controlled by the Government of Sudan to increase pressure on Khartoum to end the violence in Darfur."[38]

152.    Throughout the awful history of the GOS since 1989,

> U.S. policy in Sudan [has been] focused on achieving a definitive end to gross human rights abuses and conflicts, including in Darfur, Blue Nile and Southern Kordofan…. Sanctions underscore the U.S. commitment to ending the suffering of millions of Sudanese affected by the crisis in Darfur.[39]

153.    Thus, the U.S. Congress and the Executive Branch recognized the causal link between the GOS's access to the U.S. financial system and resulting increase in the GOS's oil revenue and the GOS's atrocities, including those committed in connection with the GOS's exploitation of its oil resources.

154.    Accordingly, the U.S. Sanctions, as established by laws of these United States and implemented by the Executive Branch were intended and expected to harm Sudan's economy and its exploitation of its oil resources and therefore to benefit disfavored civilians in Sudan and protect

---

[37] Exec. Order No. 13412, 71 Fed. Reg. 61369 (Oct. 17, 2006) (emphasis added). The Office of Foreign Assets Control ("OFAC") promulgated the Sudanese Sanctions Regulations on July 1, 1998 to implement E.O. 13067. *See* 31 C.F.R. part 538. OFAC amended the regulations on October 31, 2007 to implement E.O. 13412. It issued the Darfur Sanctions Regulations, 31 C.F.R. part 546 on May 28, 2009 to implement E.O. 13400.

[38] U.S. State Dept., U.S. Support for the People of Sudan, Nov. 20, 2007 (emphasis added), https://2001-2009.state.gov/documents/organization/95916.pdf.

[39] U.S. State Dept., U.S. Relations with Sudan Fact Sheet (Nov. 3, 2015), http://www.state.gov/r/pa/ei/bgn/5424.htm.

them from unspeakable violence at the hands of the GOS and its proxies.  Those civilians included

Plaintiffs.  Plaintiffs were therefore the legislatively-intended beneficiaries of the U.S. Sanctions.

### C.    BNPP Agreed and Conspired with the GOS to Provide Illegal Access to U.S. Financial Markets with the Understanding That This Would Sustain and Expand the GOS's Campaign of Violence and Internal Repression

155.    Faced with a compelling need for access to the U.S. financial system to develop its

oil resources and maximize its profits, a need for dollar-denominated letters of credit, and a need

for dollars to acquire goods, the GOS sought to evade the U.S. sanctions, and BNPP agreed and

conspired with the GOS to allow it to evade the impact of the sanctions and to enrich GOS.

BNPP's agreement and conspiracy with the GOS were intended to provide the means to the GOS

to continue and to increase its exploitation of its oil resources that was, and was understood to be,

part and parcel of the GOS's atrocities and campaign of human rights abuses.  BNPP did so to

make money, out of greed and desire for profits, even as it knew that its services were in support

of a terrorist, human-rights abusing regime.[40]

156.    In 1997, on the heels of the initial U.S. Sanctions, BNPP became the GOS's sole

correspondent bank in Europe, responsible for transactions that comprised a huge portion of

Sudan's exports and imports, and undertook a decade-long, secret program of violating U.S. and

New York law aimed at preventing GOS access to U.S. financial markets.  BNPP's participation

was essential to the GOS's war against its own people.

157.    BNPP's actions were made in concert with the GOS.  By 1997, the GOS had taken

total control of foreign exchange, and the GOS demanded complicity and alignment from its

---

[40] *See* Press Release, NYDFS, Cuomo Administration Announces BNP Paribas to Pay 8.9 Billion, Including $2.24 Billion to NYDFS, Terminate Senior Executives, Restrict U.S. Dollar Clearing Operations for Violations of Law (June 30, 2014) (stating that "the commercial stakes are significant"), attached as Ex. J, and is incorporated herein as if set forth in its entirety.

commercial partners in its objectives, which at that time included committing atrocities such as removing disfavored civilian populations from oil rich regions. BNPP provided the explicit, or at least implicit, acquiescence required by the GOS of its commercial partners, including avoiding any conflict with the GOS objectives, in particular, its attacks on civilian populations that occurred with greater frequency and velocity after BNNP agreed to partner with the GOS.

158.    The GOS quickly directed all major Sudanese commercial banks to use BNPP as their primary correspondent bank in Europe. As a result, nearly all major Sudanese commercial banks had U.S. dollar accounts with BNPP. For example, in that role, BNPP held U.S. dollar accounts for the GOS and for sanctioned Sudanese entities ("Specially Designated Nationals" or "SDNs") in order to process U.S. dollar transactions and develop credit for Sudanese banks.

159.    As recounted in a diplomatic cable from the U.S. Embassy to the U.S. Secretary of State, the Director of the Petroleum Unit in the Sudanese Ministry of Finance and Economic Planning Yousif Ramadan Mohammed El Hassan, confirmed BNPP's crucial role in the GOS's oil sales and revenues:

> El Hassan said that money from the sales of oil are first deposited at the Central Bank of Sudan account at [BNPP Geneva]. From there, the money is transferred to the Bank headquarters in Khartoum, the amount due to the [GOS] is transferred to the Bank of Southern Sudan (BOSS). BOSS is simply the southern branch of the Central Bank. The BOSS maintains accounts in commercial banks in Khartoum (e.g., Bank of Khartoum, Omdurman National Bank and Dubai Bank of Khartoum) as well as in Nairobi (at Stanbic Bank).[41]

Thus, revenue from the sales of oil transactions, performed and enabled by BNPP, provided revenue to the GOS.

---

[41] Diplomatic Cable from U.S. Embassy, Sudan to Intergovernmental Authority on Development and U.S. Secretary of State, *Oil Revenue: 2007 GNU Budget Based on Questionable Assumptions*, (Feb. 9, 2007), at 5, https://www.wikileaks.org/plusd/cables/07KHARTOUM194_a.html ("Feb. 9 Cable").

160.    From 1997 to 2007, Sudan's primary export and source of government revenue was—by a significant amount—oil.[42]  During that time, as admitted by BNPP in the Statement of Facts supporting its guilty plea, it "developed a business in letters of credit for the Sudanese banks. Due to its role in financing Sudan's export of oil, BNPP Geneva also took on a central role in Sudan's foreign commerce market."[43]  BNPP provided letters of credit not only on behalf of the GOS's counterparties but also on behalf of the GOS itself.  ***By 2006, BNPP's letters of credit came to represent a quarter of all Sudan's exports and a fifth of its imports***.  Over 90% of these letters of credit were denominated in U.S. dollars.[44]  One state-owned Sudanese bank's deposits at BNPP "represented about 50% of Sudan's foreign currency assets during this time period."[45]  At the time of BNPP's guilty plea, the U.S. Deputy Attorney General described BNPP as acting "as a de facto central bank for the Government of Sudan."[46]

161.    In addition to processing U.S. dollar transactions, in 2000, BNPP also developed a business in providing letters of credit for Sudanese banks that in turn facilitated the GOS's ability to buy imports, particularly those where the sellers priced their goods in dollars, thereby increasing the GOS's available resources to acquire goods.

---

[42] Foreign Trade Statistical Digest, Central Bank of Sudan, table of Trade Balances 2005-2014, at 5.  http://www.cbos.gov.sd/sites/default/files/digest_q4_14.pdf

[43] Statement of Facts dated June 30, 2014, Ex. 2 to Plea Agreement, Dkt. No. 14-CR-00460-LGS Doc. No. 13, attached as Ex. C, ¶19 (the "SOF") and is incorporated herein as if set forth in its entirety.

[44] *Id.* (emphasis added).

[45] *Id*.

[46] Remarks by Deputy Attorney General Cole at Press Conference Announcing Significant Law Enforcement Action, Justice News, June 30, 2014, https://www.justice.gov/opa/speech/remarks-deputy-attorney-general-cole-press-conference-announcing-significant-law.

162.    On information and belief, BNPP's letters of credit covered a significant part of Sudanese imports and therefore enabled the GOS to import weapons and other goods sold in dollars.  Similarly, on information and belief, BNPP's letters of credit covered a significant part of Sudanese exports and therefore facilitated and increased revenues from Sudan's crude oil sales, which accounted for nearly all of the country's exports.

163.    Thus, by having access to dollars and dollar-denominated letters of credit to purchase goods to import, the GOS was able to purchase materially more imports than it otherwise would because dollars, as the leading global currency, are more desirable than other currencies, are preferred to bartering, and are more widely accepted.  In other words, BNPP's assistance gave the GOS more buying power than it otherwise would have had.  As described above, U.S. Sanctions were intended to prevent this precise outcome.

164.    BNPP continued its key role clearing transactions through or into the United States until 2007 when the U.S. authorities alerted BNPP to their investigation, holding U.S. dollar accounts for the GOS and sanctioned Sudanese entities ("Specially Designated Nationals" or "SDNs") in order to process illegally U.S. dollar transactions in New York and develop credit for Sudanese banks.

165.    To enable it to continue its conspiracy with the GOS, for as long as it did, BNPP agreed with the GOS to use deceptive procedures and transaction structures to avoid U.S. screening procedures that identify and block transactions involving sanctioned entities.  For example, BNPP concealed its illicit conduct by modifying or omitting references to SDNs in U.S. dollar transactions, including letters of credit, processed through the United States.

166.    BNPP also agreed with the GOS to evade sanctions by using banks unaffiliated with BNPP or Sudan to process illicit transactions.  BNPP called them "satellite banks."  In these

transactions, Sudanese banks seeking to settle U.S. dollar transactions through New York first transferred funds within BNPP to a satellite bank's BNPP account. The satellite bank transferred the funds to a U.S. bank and then on to the Sudanese bank's intended beneficiary. This was all done without reference to Sudan or the Sudanese bank, which was not the usual and customary method. To help to obscure the ultimate reason for the transactions, BNPP often instructed the satellite bank to wait a day or more to clear the funds through New York. The process was reversed to get U.S. dollars into Sudan from third parties not located within the country.

167. This satellite bank structure had no purpose other than to evade U.S. Sanctions, and the deceptive transaction-clearing procedures used by BNPP, enabled the SDNs to process thousands of illicit U.S. dollar transactions worth billions of dollars.[47]

168. Even after having some "deficiencies" caught by U.S. regulators, BNPP continued its conspiracy with the GOS. In 2004, the FRB-NY and the DFS first identified "deficiencies in [BNPPNY's] monitoring of transactions with overseas clients, including the processing of U.S. dollar transactions for overseas clients."[48] In September 2004, BNPP entered into a Memorandum of Understanding ("MOU") with the FRB-NY and the DFS that required, *inter alia*, that BNPPNY improve its systems for compliance with U.S. Sanctions. Instead, BNPP simply shifted the processing of U.S. dollar transactions—doctored to conceal any Sudan connection—from BNPP's New York branch to flow through an unaffiliated bank which, on information and belief, was also New York-based. Thus, though the bank may have changed, BNPP continued to structure and accomplish settlement in New York of U.S. dollar transactions for the SDNs.

---

[47] SOF, Ex. C, ¶24.

[48] *Id*. ¶28.

**D.** **With Access to Petrodollars Provided by BNPP, Sudan's Exports of Oil and Revenues Rose Dramatically**

169.    Between 1998 and 2007, Sudan's oil production rose dramatically, and in turn, total GOS revenue grew substantially.

170.    Through BNPP financing, letters of credit in U.S. dollars, and *de facto* money laundering, the GOS transformed Sudan's rudimentary oil industry quickly and dramatically. World Bank data shows the 1997-2006 growth in Sudan's oil production, measured in 1,000s of barrels of oil per day.[49]  In 1997, Sudan produced 9,000 barrels of oil per day.  Just two years later, it produced 63,000 barrels per day and by 2006, Sudan's oil production had exploded to 331,000 barrels per day.

171.    On information and belief, GOS revenues from Sudan's export of oil also grew significantly rising from less than $2 billion in 2002 to nearly $10 billion in 2007.[50]  Sudan's increased oil production, exports and revenues were made possible only by its illegal financial transactions with BNPP.

172.    The fact that BNPP's partnership with the GOS to violate Sanctions was a substantial, causal factor in Sudan's increased oil production, exports and revenues is further demonstrated by the experience of other countries subject to U.S. sanctions.  Economic sanctions imposed against Iran in 2005 by the United States and the European Union are a case in point.

---

[49] Data from the World Bank, http://data.worldbank.org/country/sudan.

[50] European Coalition on Oil in Sudan, Sudan: Whose Oil?, at 25 (April 2008).  This comports with U.S. State Department data, which estimated that in 2002, Sudan's oil production yielded overall revenues as high as $1.2 billion.  *See* Press Release accompanying 2003 U.S. Department of State Sudan Peace Act Report to Congress. Press Release, State Dept., Sudan Peace Act: Presidential Finding and Reports to Congress (April 22, 2003), http://reliefweb.int/report/sudan/sudan-peace-act-presidential-finding-and-reports-congress.

Iran had to price its oil in the currencies of its main customers, China and India.[51]  Because their currencies are not readily convertible, Iran sold its oil for a significant discount, which may have been as much as ten percent.[52]  If Sudan—a poorer, less economically powerful, and less geopolitically important country than Iran, and, therefore, less able to barter or support its oil pricing—were to have suffered the same ten percent discount in 2006, when the country produced 331,000 barrels per day, it would have represented a potential loss of about $730 million or $2 million a day, an amount equal to about 30% of the GOS's 2006 military spending.

173.    When not undermined as they were in Sudan, U.S. financial sanctions are a potent economic tool in curbing the violent and repressive conduct of governments such as the al-Bashir regime.

### E.    As a Result of Increased Oil Revenues, Military Spending Grew, Both in Total Dollars and as a Percentage of Government Spending

174.    Plaintiffs are informed and believe that the proceeds to the GOS from BNPP's Sanctions violations during all or most of the period of Plaintiffs' injuries exceeded the GOS's total military expenditures.  They were such a substantial source of revenue that the GOS could

---

[51] Kennth Katzman, Cong. Research Serv., RS20871, *Iran Sanctions*, at 51-52 (Oct. 11, 2013).

[52] See Wayne Ma and Tennille Tracy, Sanctions Gap Allows China to Import Iranian Oil; Beijing Bypasses U.S. Law by Importing More Fuel Oil Not Covered by Sanctions, Wall St. J. Online, Aug. 21, 2013,; *see also* Asia, Black Market Only Options for Iran's Crude, Petroleum Intelligence Weekly, Apr. 23, 2012.  This discount was not the only significant financial harm that Iran suffered as a result of the sanctions on its oil production.  Royal Dutch Shell, a Anglo-Dutch oil company and one of Iran's customers, was unable to remit to Iran $2 billion for oil it purchased prior to the sanctions going into effect.  See Benoit Faucon, Shell CEO Discusses $2 Billion Debt Payment With Iran Oil Minister, Wall St. J. Online, June 3, 2015, http://www.wsj.com/articles/shell-ceo-discusses-2-billion-debt-payment-with-iran-oil-minister-1433359074; see also Emmanuel Hache and Olivier Massol, Sanctions against Iran: An Assessment of their Global Impact Through the Lens of International Methanol Prices, at 7 (IFP Énergies Nouvelles, Working Paper 106, Apr. 2016), https://www.researchgate.net/profile/Emmanuel_Hache/publication/301222462_Sanctions_against_Iran_An_assessment_of_their_global_impact_through_the_lens_of_international_methanol_prices/links/570d602008ae3199889bbf62.pdf.

otherwise not have funded the military at the nearly same level without BNPP's Sanctions violations during the period when GOS's military and proxy militia forces operated and funded by the GOS inflicted Plaintiffs' injuries. Enabled by petrodollars, GOS troops and their surrogate paramilitaries caused the violent death and injury of thousands of Darfuris and citizens of central and south Sudan.

175. At the start of BNPP's involvement, the GOS's oil revenue was insignificant; by 2006, according to World Bank data, oil revenue accounted for more than 10% of GDP.[53]  The GOS spent a disproportionate, increasing amount of its growing revenues on the military, the National Intelligence and Security Services (NISS), the Popular Defense Forces (PDF), and the other formal and informal branches of the GOS's coercive apparatus. On information and belief, during most years when BNPP was processing oil exports for the GOS, military spending alone (*i.e.*, the officially allocated budget for the Sudanese Armed Forces) as a percentage of total GOS spending was more than double, or even triple, what it had been pre-BNPP. ***Between 1997 and 2006, GOS military spending grew nearly ten-fold: from $282 million in 1997 to $2.7 billion in 2006, and, as a share of GDP, went from less than 1% to nearly 3.4%***.[54] To spend this percentage of GDP on the military is quite remarkable, particularly for a poor country.

176. Because true military spending is not public information, these figures are approximate. Moreover, the figures almost certainly underestimate the GOS's actual military spending because they most likely do not include the money the GOS spent on the NISS, its most important secret service, and the various militias the GOS supported.

---

[53] World Bank, Sudan Public Expenditure Review: Synthesis Report, at 9 (Report No. 41840-SD, Dec. 2007).

[54] *See* Stockholm International Peace Research Institute, SIPRI Military Expenditure Database, https://www.sipri.org/databases/milex.

177. The U.S. Embassy in Khartoum recognized the extent of Sudan's military spending: In 2007, Sudan's "budget allocate[d] substantial revenue to military and security expenditures, leaving relatively small amounts available for development, health and education."[55]

178. In its country status report, the World Bank observed the connection between the GOS's oil revenues and the continuing conflict: "Petroleum has emerged as a major source of economic growth and revenue for the government.  It has also emerged as one of the major factors that keeps the war going."[56]

179. The GOS's vast increase in oil revenue, made possible only because of BNPP enabled the GOS to grow its military spending and to keep the war going.[57]

**F.    Sudan Used its Oil Revenue to Buy and Manufacture Weapons and Weapons Delivery Systems**

180. The GOS used the oil wealth that it acquired thanks to BNPP's criminal actions to embark on a major weapons acquisition spree.  The GOS did not just purchase standard guns and ammunition.  It purchased modern, highly sophisticated, and extremely expensive armaments capable of inflicting massive amounts of harm and damage in a ruthlessly efficient manner.  Sudan's major weapons suppliers included China, Russia, Ukraine, Iran, and Belarus.[58]

---

[55] Feb. 9 Cable ¶ 1.

[56] World Bank, Sudan, Country Economic Memorandum: Stabilization and Reconstruction, Report No. 24620-SU, at 18 (June 2003), http://documents.worldbank.org/curated/en/440091468777571140/main-text.

[57] When BNPP began its involvement in Sudan, Sudan was in arrears on the repayment of its foreign debt and could not have borrowed more money from the international debt market without the additional oil revenue.  By the end of 2001, Sudan's foreign debt was $20.9 billion, almost twice the country's GDP.  *See* Republic of Sudan and European Community, Country Strategy Paper and National Indicative Programme for the Period 2002-2007, DEV/0116/EN, at 11-13 (Oct. 2002).

[58] Like its oil revenues, the GOS's arms purchases are likely underreported.  Therefore, the extensive weapons acquisitions detailed herein likely understate the full extent of what the GOS bought.

181.    The GOS's access to U.S. dollars that BNPP provided, on information and belief, enhanced the GOS's ability to import weapons, especially from suppliers in countries with nonconvertible currencies, such as those above.  Arms suppliers prefer payment in U.S. dollars for the same reasons as oil exporters—convertibility, liquidity, and stability.

182.    One branch of its military that the GOS focused on expanding was its air force. Prior to 1997, Sudan had only a rudimentary air force, composed of a small number of aging aircraft.  This changed once the GOS started receiving its oil revenues.  During the relevant period, the GOS purchased tactical attack jets (such as the MiG-29 and Su-25), combat helicopters (such as the Mi-17), helicopter gunships (such as the Mi-24),[59] and goods and troop transports (such as Antonovs).[60]  The GOS retrofitted many of the cargo planes into crude bombers from which barrel bombs were simply rolled out of the cargo bay and onto unsuspecting victims.[61]  Indeed, in just one year, 2001, the GOS *tripled* its fleet of attack helicopters by purchasing twelve Russian made aircraft.[62]  The MiG-29s were particularly expensive.  On information and belief, each plane cost $11 million, before the additional, substantial expenses of service and training contracts.[63]

183.    The GOS also spent its oil revenue building up its small arms and military hardware reserves.  For example, the GOS purchased Russian armored combat vehicles, large-caliber

---

[59] *See* Small Arms Survey – Supply and Demand, Arms Flow and Holdings in Sudan, HSBA (Dec. 2009), http://www.smallarmssurveysudan.org/fileadmin/docs/issue-briefs/HSBA-IB-15-arms-flows-and-holdings-in-Sudan.pdf.

[60] *See* Amnesty International, Sudan: Arming the Perpetrators of Grave Abuses in Darfur, at 19, 35-36 (Nov. 16, 2004), https://www.amnesty.org/en/documents/afr54/139/2004/en/

[61] *See* Amnesty International, Blood at the Crossroads: Making the Case for a Global Arms Trade Treaty, at 86-87, 94 (Sept. 17, 2008), https://www.amnesty.org/en/documents/ACT30/011/2008/en/.

[62] *See* Human Rights Watch, Sudan, Oil, and Human Rights, at 37 (2003).

[63] *See* How Much Does a MiG-29 Cost?, Angel Fire, http://www.angelfire.com/falcon/fighterplanes/texts/articles/MiG-29.html.

artillery systems from Belarus, Chinese made WeiShi-2/3 missiles (which have a range of 200 kilometers), tanks, armored personnel carriers, infantry fighting vehicles, multiple rocket launchers, portable surface to air missiles, recoilless rifles, mortars of various sizes, and heavy machine guns (such as Russian-built "Doshka" machine guns).[64]

184.    Further, the GOS used its oil revenue to establish a domestic weapons industry. Beginning in the late 1990s, Sudanese officials boasted of using its oil revenues to develop the ability to manufacture ammunitions, mortars, tanks, and armored personnel carriers.[65]  On January 7, 2002, the GOS paraded its domestically produced hardware in central Khartoum.

185.    The GOS used its new resources to manufacture its own armaments: "[Sudan] will this year reach self-sufficiency in light, medium and heavy weapons from local production," thanks to its "***unprecedented economic boom particularly in the field of oil exploration and exportation***."  (emphasis added).  Sudan also produced rocket-propelled grenades, machine guns, and mortars.[66]

186.    The GOS shared many of its weapons, particularly the small arms, with the various proxy militias that fought under the government's direction to achieve its awful aims.  For example, the GOS provided militias with Russian-made arms.

187.    The effects of Sudan's enhanced military procurements during this period continue to be felt through today due to the long shelf lives of many of the military hardware and weapons

---

[64]  *See* Eric Reeves, Kleptocracy in Khartoum: Self-Enrichment by the National Islamic Front/National Congress Party, Enough Project, Dec. 2015, http://www.enoughproject.org/files/EnoughForum_KleptocracyInKhartoum_Reeves_Dec2015.pdf

[65]  *See* Human Rights Watch, Sudan, Oil, and Human Rights, at 353 (2003), https://www.hrw.org/reports/2003/sudan1103/sudanprint.pdf.

[66] Sudan to Achieve Self-Sufficiency in Weapons: Spokesman, Agence France Presse – English, July 1, 2000.

the GOS purchased. Thus, planes helicopters and weapons bought by the GOS between 1997 and 2007 continue to kill and harm civilians, and have been instrumental in displacing millions of people. Further, Sudan's own ability to manufacture weapons, an ability it gained between 1997 and 2007 continues through today.

188.    In sum, BNPP's actions in facilitating the GOS's development of its oil industry and its economy overall were a substantial factor in facilitating the growth of the GOS's budget, its military spending, its acquisition of weapons, and the creation of a domestic arms industry.

### G.    Well-Funded by Oil Revenues and Equipped with Newly Purchased Weapons, Sudan Increased its Violence Against Civilians, Including Plaintiffs.

189.    With its new oil wealth and modernized army, that it had as a result of its conspiracy with BNPP the GOS went from a regime besieged on all sides—with rebels advancing in the south and east of the country, threatening to break the back of the Sudanese Armed Forces—to a government that was aggressively asserting its authority throughout the country, smashing any rebel hopes of advancing on Khartoum or capturing other major cities.

190.    In the process of securing its hold on power, the GOS engaged in systematic, widespread human rights abuses on a scale unseen before. These atrocities included ethnic cleansing, violent forced displacement, and terror tactics such as arbitrary detention, theft, torture, rape, and murder as well as genocide, all in contravention of international law. These inhuman depredations were experienced in various forms by all Plaintiffs and their communities, which were often defined ethnically—as "non-Arab" by the GOS and its proxies—and geographically—southern Sudan and Darfur.

191.    Plaintiffs were often victims of brutal sexual violence. The GOS used this violence as a means of terror, torture, and ethnic cleansing.

192.    The GOS used its new air force to project its power on a scale it could not have contemplated before 1997.  For example, the GOS used its helicopter gunships in the Western Upper Nile and Unity State, much of which is now part of South Sudan.

193.    Similarly, the GOS used its retrofitted Antonov cargo planes to attack civilians in southern Sudan, the Nuba Mountains of South Kordofan, southern Blue Nile State, the Jebel Marra region in central Darfur, as well as numerous other regions in Darfur.  These attacks were particularly cruel because the purposefully crude nature of the retrofit made the Antonovs highly inaccurate, leading to massive amounts of terror in those regions.

194.    The GOS also used its oil money to finance third party militias who also committed significant acts of violence.  These militias acted as proxies for the GOS, killing, raping, and displacing large numbers of civilians, many of whom belonged to ethnic groups associated with the rebels, such as Dinka (who were primarily in Abyei and South Sudan), Ingessana (Blue Nile), Fur (Darfur), and Zaghawa (Darfur).  The most infamous militia was the Janjaweed, also known as the Jingaweid, which was under the GOS's control.  It wreaked havoc in Darfur from 2002 onwards.[67]  This region is home to various non-Arab groups, including the Fur, Zaghawa, and Massalit.  Often, the GOS's military and the Janjaweed worked in tandem to brutal ends.  After the GOS's air force bombarded a village, the Janjaweed would attack on horseback, brandishing GOS-provided weapons.  The militiamen swept into villages, killing and mutilating the men,

---

[67] *See* U.S. State Dept. Fact Sheet, Sudan: Ethnic Cleansing in Darfur (Apr. 27, 2004), https://2001-2009.state.gov/g/drl/rls/31822.htm:

"The Government [GOS] operates jointly with these militias, known as 'Jingaweid,' in attacks on civilians from the Fur, Masaalit, and Zaghawa ethnic groups.  …The Jingaweid have perpetrated widespread atrocities against theses civilians." …In February 2004, an eyewitness account of a raid on the village of Tawila noted that a well-organized attack by horseman and members of the military dressed in fatigues in which 67 people were killed, 16 girls abducted and over 93 females were raped.  The attack displaced over 5,000 people."

raping the women, and killing or kidnapping the children. The raiders also destroyed the foundations of the village, burning fields and homes, poisoning wells, and seizing anything of value.

195.    The GOS's actions in Darfur are frequently labeled as crimes against humanity and genocide by the international community. As set out above, those actions were recognized as genocide by the U.S. Congress, as well as Secretary of State Colin Powell and President Bush in 2004, a time when BNPP continued to violate U.S. Sanctions.[68] The U.N. Security Council referred the situation in Darfur to the ICC in March 2005. In 2007, the ICC issued its first arrest warrants for Sudanese government officials.[69] The genocide began in 2003 and continued through the signing of a ceasefire in 2004, a peace agreement in 2006, to today. It was made possible in substantial part by BNPP's financial support of the GOS.

196.    Plaintiffs from Darfur were victims of brutal attacks by the GOS-funded Janjaweed.

197.    Much of the focus of the GOS's attacks was on civilians living in the path of oil development. The GOS's ability to exploit its oil after 1997 thus intensified pre-existing conflicts as the GOS sought to monopolize the gains from oil and, in the process, cleansed, by brute force, the oil rich regions of their native inhabitants. Essentially, the GOS used its military and paramilitary forces to remove entire villages living on or near oil fields. A Chinese geologist on the ground in Sudan described this forced displacement in 2000 from Heglig in the disputed Abyei region:

---

[68] Glen Kessler and Colum Lynch, *U.S. Calls Killings in Sudan Genocide, Khartoum and Arab Militias Are Responsible, Powell Says*, Wash. Post, Sept. 10, 2004, www.washingtonpost.com/wp-dyn/articles/A8364-2004Sep9.html; George W. Bush Address to United Nations (Sept. 21, 2004), http://www.presidentialrhetoric.com/speeches/09.21.04.html.

[69] International Criminal Court - Situation in Darfur, Sudan, ICC-02/05, (Dec. 22, 2016), https://www.icc-cpi.int/darfur.

I was based at a Chinese camp in Heglig, which was located close to the main camp of Talisman. We (workers of the Chinese company) were guarded by Sudanese soldiers all the time. Every time we went to the field to conduct exploration activities, the soldiers went ahead and shot into the bush with big guns to cause the natives to flee. Then the soldiers informed the Chinese that it was safe. We moved into the area and did the required work. In some places, we found deserted villages and burnt houses. Also, we found human bodies in the exploration area and dead elephants.[70]

198.    In its 2003 report to Congress, the U.S. State Department recognized this horrifying connection between oil exploitation and the GOS's atrocities. Specifically, the State Department found that the increase in oil production "translated into at least proportionally increased military expenditures by the [GOS]."[71] The report noted that between 2002 and 2003

most reported incidents of attacks on civilians and forced displacement have occurred in Western Upper Nile, most as a result of actions by the government and its allied militias. Various types of violent actions against civilians have been used to compel their displacement from their usual areas of habitation, including killing, rape, abduction, burning of shelters, and looting of property (including cattle and crops) necessary for livelihood.[72]

199.    The State Department also found that these types of attacks "have been regularly reported throughout the history of the civil war."[73]

200.    Many were victims of the GOS's crimes simply because they had the misfortune of being on or near an oil field.

201.    Those people who were fortunate enough to survive the GOS's onslaught were forced to leave their homes with nothing more than a mat or some cattle. The unlucky ones had

---

[70] *See* Leben Moro, *Oil Development Induced Displacement in the Sudan* (University of Durham, Institute for Middle Eastern and Islamic Studies, Working Paper 10, 2009), at 14. http://dro.dur.ac.uk/6232/1/6232.pdf.

[71] State Dept., Sudan Peace Act: Presidential Finding and Reports to Congress (Apr. 22, 2003).

[72] *Id*.

[73] *Id*.

to take refuge in the bush. According to the NGO, the Internal Displacement Monitoring Centre, as of August 2006, there were approximately 5 million IDPs in Sudan; 1.8 million were from Darfur.[74]

202.    Many of the IDPs fled to Khartoum, believing they would be safe. However, once there, they were subjected to yet more horrors. For example, many people who were part of disfavored groups were put into "ghost houses," secret detention facilities where many of the inmates were tortured used "unspeakably sadistic methods."[75] The GOS's use of ghost houses started before BNPP's involvement and continued throughout the relevant period.[76]

203.    Though the Fur, Zaghawa, Massalit, and other non-Arab ethnic groups in Darfur may have been the most reported on ethnic groups that were harmed by the GOS, they were hardly

---

[74] iDMC, Slow IDP Return to South While Darfur Crisis Continues Unabated, at 1 (Aug. 17, 2006), http://www.internal-displacement.org/sub-saharan-africa/sudan/2006/slow-idp-return-to-south-while-darfur-crisis-continues-unabated.

[75] Claude Adams, *On the Run from Sudan's Enforcers*, Globe and Mail (Canada), Oct. 21, 1995.

[76] *See, e.g.*, Caroline Cox, John Eibner, *The Government of Sudan Enslaves its Own*, Asian Wall St. J., July 30, 1996, at 6; Caroline Cox, John Eibner, *Sudan Government Enslaves its Own*, Wall St. J. Europe, May 21, 1996, at 10; Claude Adams, *On the Run from Sudan's Enforcers*, Globe and Mail (Canada), Oct. 21, 1995; Con Coughlin, *Sudan Training Next Terrorist Generation*, Globe and Mail (Canada), May 16, 1994; Eileen Alt Powell, *Suffering Rises in Sudan, U.S. Suspects it of Backing Terrorism, Cuts Aid*, Miami Herald, Jan. 9, 1994, at B4; William Johnson, *The Stakes are High for Muslims*, Globe and Mail (Canada), Nov. 1, 2001, at A25; *Sudan vs. Civilization*, Wall St. J. Europe, Oct. 10, 2000, at 12; Peter Dalglish, *Witness to War*, Globe and Mail (Canada), Feb. 18, 2000, at A13.

The U.S. government also took note of the ghost houses: "The [GOS] human rights record remained extremely poor, and it continued to commit numerous, serious abuses. Citizens do not have the ability to change their government peacefully. Government forces were responsible for extrajudicial killings and disappearances. Government security forces regularly tortured, beat, harassed, arbitrarily arrested and detained, and detained incommunicado opponents or suspected opponents of the [GOS] with impunity. Security forces beat refugees, raped women, and reportedly harassed and detained persons on the basis of their religion. Prison conditions are harsh, prolonged detention is a problem, and the judiciary is largely subservient to the Government." State Dept., Sudan - Country Report on Human Rights Practices, 1999, at 2 (Feb. 23, 2000), http://www.state.gov/
j/drl/rls/hrrpt/1999/273.htm

the only ones.  Other communities that the GOS harmed include the Dinka Ngok in Abyei, the Nuba in South Kordofan, and the various ethnic groups in the Blue Nile (particularly the Ingessana), as well as civilians from various ethnic groups along the North/South border, from Upper Nile State to Western Bahr el Ghazal.  The GOS particularly victimized the Nuer communities of Unity State (formerly Western Upper Nile) during 2002, the last year of major fighting in the Second Sudanese Civil War.  In addition, the eastern Sudan states of Red Sea, Kassala, and Gedaref (particularly the Beja people) suffered terribly from economic and political marginalization and domination by the GOS.  The Nubian people of far northern Sudan were similarly marginalized and harmed by environmentally and economically irresponsible dam projects along the Nile.  Many thousands of farmers from this community were displaced from their lands without compensation.

204.    Children were also subjected to atrocities at the hands of the GOS, including physical violence and mental harm as a result of the GOS's persistent terror against themselves and their families.

205.    BNPP's violations of U.S. Sanctions, assistance to, and conspiracy with the GOS, enabled the GOS to have increased resources to terrorize and exterminate politically disfavored civilian.  Thus, BNPP's actions were a substantial factor in causing injuries to Plaintiffs.

**H.    Plaintiffs' Injuries Were Foreseeable:  BNPP Knew the Atrocities in Sudan Were Funded By and an Intrinsic Part of the Government of Sudan's Exploitation of Its Oil Resources, Which BNPP Made Possible**

206.    Throughout its long partnership with the GOS, BNPP knew and accepted that: (*i*) the GOS was engaged in a persistent campaign of terrible atrocities against Sudanese civilian groups, including genocide; and (*ii*) the GOS's monetization of its oil—made possible through BNPP's criminal sanctions violations and falsification of business records in New York—was both

a principal object of and the prerequisite for the GOS's atrocities.  Extensive reporting—by the United Nations, the governments of the United States and Canada, the ICC, international NGOs, and the international press—documented both the GOS's crimes and the causal link between those actions and its oil revenues.  Yet BNPP kept up its depraved, illegal conspiracy with the GOS.

1.    **Contemporaneous Reporting of the Atrocities in Sudan and the Connection to Oil**

207.    Even before 1997, the international community had recognized and condemned GOS atrocities against Sudanese civilians.  For example, in his 1995 *Interim Report on the Situation of Human Rights in the Sudan*, the U.N. Special Rapporteur on Human Rights in the Sudan reported "grave and widespread violations of human rights by government agents," including "[i]ndiscriminate and deliberate aerial bombardments by government forces on civilian targets."[77]

208.    In 1997, the international media widely reported on the imposition of U.S. Sanctions.[78]

209.    In 1999, the U.S. State Department's "Country Reports on Human Rights Practices" reported on Sudan's dismal human rights record, setting out serious abuses including extrajudicial killings, beatings rape, arbitrary, and forced conscription.[79]

---

[77] Gaspar Biro (Special Rapporteur of the Commission on Human Rights), *Interim Report on the Situation of Human Rights in the Sudan,* ¶¶ 10, 72, U.N. Doc. A/50/569 (Oct. 16, 1995). Concerning Resolution 1955/77 (Mar. 8, 1995). http://www.un.org/documents/ga/docs/50/plenary/a50-569.htm.

[78] *See, e.g.*, Norman Kempster, *U.S. Imposes Tougher Sanctions on Sudan*, L.A. Times, Nov. 5, 1997; AFP, *U.S. Sanctions Punish Sudan*, The Australian, Nov. 6, 1997.

[79] *See* State Dept., Sudan - Country Report on Human Rights Practices - 1999 (Feb. 23, 2000) http://www.state.gov/j/drl/rls/hrrpt/1999/273.htm.

210.    In 2000, Doctors Without Borders/Médecins Sans Frontières, recipient of the 1999 Nobel Peace Prize, reported on the GOS's use of indiscriminate bombings and chemical weapons against civilians.[80]

211.    In 2001 and 2002, the international media covered GOS attacks on civilians, including its use of attack helicopters, to clear civilians from oil blocks, especially Blocks One and 5A.[81]

212.    A 2002 report by the U.N. Special Rapporteur on Human Rights in Sudan concluded that, "the overall human rights situation has not improved" since 2001 and that "oil exploitation is closely linked to the conflict which . . . is mainly a war for the control of resources and, thus, power."[82]  The Rapporteur "noted that oil exploitation continued to cause widespread displacement" and, as a result, has "seriously exacerbated the conflict while deteriorating the overall situation of human rights."[83]

213.    In 2003, Human Rights Watch published its landmark report, "Sudan, Oil, and Human Rights," detailing the link between oil and human rights violations.[84]  It focused on the plight of southern Sudanese from the oil-producing areas, especially the Nuer and Dinka, who

---

[80]  *See* Doctors Without Borders/Médecins Sans Frontières (MSF), Living under Aerial Bombardments: Report of an Investigation in the Province of Equatoria, Southern Sudan (Feb. 20, 2000),  http://reliefweb.int/report/sudan/living-under-aerial-bombardments-report-investigation-province-equatoria-southern-sudan.

[81]  Norimitsu Onishi, *Sudan Government Tops List of Those Causing Agony for Oil*, N.Y. Times, Oct. 13, 2001; W.F. Deedes, *Innocent Victims of Sudan's Forgotten War*, Daily Telegraph (London), Apr. 27, 2002.

[82]  Gerhart Baum (Special Rapporteur on the Commission of Human Rights), *Situation of Human Rights in the Sudan*, at 3-4, U.N. Doc. E/CN.4/2002/46 (Jan. 23, 2002).

[83]  *Id*. at 3, 12.

[84]  *See* Human Rights Watch, Sudan, Oil, and Human Rights (2003), https://www.hrw.org/reports/2003/sudan1103/sudanprint.pdf.

were displaced to facilitate oil operations through ethnic manipulation, direct military attack, and aerial bombing. The report noted that, in addition to funding large purchase of weapons made elsewhere, "[t]he new oil revenue also facilitated a brand-new domestic arms industry."[85]

214.    In February 2004, the U.S. Department of State released its 2003 Human Rights report on Sudan. The report stated:

> Security forces and associated militias were responsible for extrajudicial killings and disappearances. Security forces regularly beat, harassed, arbitrarily arrested, and detained incommunicado opponents or suspected opponents of the Government, and there were reports of torture. Security forces and associated militias beat refugees, raped women abducted during raids, and harassed and detained persons. Government security forces and pro-government militias acted with impunity. . . . Government forces pursued a scorched earth policy aimed at removing populations from around the oil pipeline and other oil production facilities, which resulted in deaths and serious injuries.[86]

215.    In March 2004, the U.N. humanitarian coordinator for Sudan, Mukesh Kapila, told the press that an "ethnic cleansing" campaign was taking place in Darfur that was "comparable in character, if not in scale," to the Rwandan genocide.[87]

216.    In April 2004, Human Rights Watch's report, "Darfur in Flames: Atrocities in Western Sudan,"[88] described an oil-fueled government strategy of forced displacement targeting civilians.[89]

---

[85] *Id.* at 353.

[86] U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, Sudan, at 2, 12 (Feb. 25, 2004), https://www.state.gov/j/drl/rls/hrrpt/2003/27753.htm.

[87] *Mass Rape Atrocity in West Sudan*, BBC News, Mar. 19, 2004, http://news.bbc.co.uk/2/hi/africa/3549325.stm.

[88] Human Rights Watch Report, Darfur in Flames: Atrocities in Western Sudan (Vol. 16, No. 5 (A) Apr. 2004), https://www.hrw.org/reports/2004/sudan0404/sudan0404.pdf.

[89] *See id.* at 15-17.

217.    In July 2004, the House and the Senate passed House Concurrent Resolution 467, declaring that the GOS's atrocities in Darfur violated the Convention on the Prevention and Punishment of the Crime of Genocide.[90]

218.    In early September 2004, U.S. Secretary of State Colin Powell publicly stated that a "genocide has been committed" in the Sudanese region of Darfur.[91]

219.    In mid-September, 2004, the Security Council adopted Resolution 1564 requesting, *inter alia*, that the Secretary General,

> rapidly establish an international commission of inquiry in order immediately to investigate reports of violations of international humanitarian law and human rights law in Darfur by all parties, to determine also whether or not acts of genocide have occurred, and to identify the perpetrators of such violations with a view to ensuring that those responsible are held accountable.[92]

220.    In November 2004, Human Rights Watch published its report "If We Return, We Will be Killed: Consolidation of Ethnic Cleansing in Darfur, Sudan," focusing on the horrors faced by the approximately two million people driven from their homes.

221.    In January 2005, the Report of the International Commission of Inquiry on Darfur to the United Nations Secretary General, which the Security Council requested in Resolution 1564, was published.  The Report took "as the starting point for its work" the "irrefutable facts" that "there are 1.65 million internally displaced persons in Darfur, and more than 200,000 refugees from Darfur in neighboring Chad," and that "there has been large-scale destruction of villages

---

[90] *See* H.R. Con. Res. 467, 108th Cong. (2004) (enacted). https://www.congress.gov/bill/108th-congress/house-concurrent-resolution/467.

[91] *Powell Calls Sudan Killings Genocide*, CNN.com, Sept. 9, 2004, at 1, http://www.cnn.com/2004/WORLD/africa/09/09/sudan.powell/.

[92] S.C. Res. 1564, ¶ 12 (Sept. 19, 2004), http://www.un.org/en/ga/search/view_doc.asp?symbol=S/RES/1564(2004).

throughout the three states of Darfur."[93]  After a "thorough analysis of the information gathered in the course of its investigations," the Report found "that the [GOS] and the Janjaweed are responsible for serious violations of international human rights and humanitarian law amounting to crimes under international law."[94]

222.    In June 2005, the ICC opened its investigation into the crisis in Darfur,[95] which ultimately led to the issuance of arrest warrants for President al-Bashir, other GOS officials, and a Janjaweed commander.

223.    On December 8, 2005, Human Rights Watch published a further report on the crisis in Darfur, "Entrenching Impunity: Government Responsibility for International Crimes in Darfur." It documented the role of civilian and military officials in the use of Janjaweed militias and the Sudanese armed forces to commit war crimes and crimes against humanity since mid-2003.

### 2.    Three Companies, Talisman, Lundin, and OMV, Were Forced to Withdraw from Sudan by Public Pressure

224.    In addition to the reports above, the news media extensively covered the three Western companies, Talisman, Lundin, and OMV, which were publicly known to be doing business with the GOS.  Notable, none of these companies provided, or were capable of providing, access to the U.S. financial system, essential for exporting oil in petrodollars at market prices.

225.    Talisman, a Canadian company, was the operator of GNPOC's concession for three blocks in Sudan, including Block One.  Throughout 1999, the GOS launched a bloody campaign to kill or displace civilians living in Block One, primarily the Dinka, a black African ethnic group

---

[93] Rep. of the Int'l Comm'n of Inquiry on Darfur to the U.N. Secretary-General, at 3 (Jan. 25, 2005).

[94] *Id.*

[95] Situation in Darfur, Sudan, ICC Investigations Opened: June 2005, ICC-02/05, https//www.icc-cpi.int/darfur.

that the GOS considered hostile because the bulk of the rebels in the region were drawn from Dinka ranks. The GOS used government troops, aerial bombardment, and militias to displace and kill those civilians unfortunate enough to live near Block One. As the ground troops and militias swept through the Dinka communities, many of them looted freely and burned whatever was left.[96]

226.    In May of 1999, in a major offensive on Block One, the GOS made an all-out effort to clear civilians from the Block, using its Antonov bombers, helicopter gunships, tanks, armored personnel carriers, and proxy militiamen. The GOS indiscriminately attacked civilians and destroyed items necessary for survival including food, huts, and seeds. This drive succeeded in scattering residents away from Block One towards the north and south. Though most of the displaced were Dinka, some Nuer, who sought shelter in the region after they were previously kicked out of their homes, were also displaced. [97]

227.    Talisman's annual shareholder meeting in May 1999 was marked by a shareholder proposal—blocked by management—criticizing the company's business in Sudan and by demonstrators protesting the company's profiting from the GOS's atrocities.[98]

228.    The U.S. government also criticized Talisman's business in Sudan. In late 1999, Secretary of State Madeleine Albright personally expressed her displeasure to Canada's Foreign Minister Lloyd Axworthy, leading him to take "the unusual step of publicly expressing grave reservations about Talisman's involvement in Sudan."[99]   Axworthy also directed John Harker, a

---

[96] Human Rights Watch, Sudan, Oil, and Human Rights, at 186-95 (2003).

[97] *See id.* at 187-93.

[98] *See id.* at 394-96; *see also* Ian Fisher, *Oil Flowing in Sudan, Raising the Stakes in Its Civil War*, N.Y. Times, Oct. 17, 1999, http://www.nytimes.com/1999/10/17/world/oil-flowing-in-sudan-raising-the-stakes-in-its-civil-war.html.

[99] Madelaine Drohan, *Sudan Play Bad Timing For Talisman*, Globe & Mail, Oct. 27, 1999, at B2.

former director of affairs for the Canadian Labor Congress, to investigate Talisman's Sudanese business.[100]

229.    In January 2000, the Canadian Foreign Ministry issued its report on Talisman's business.[101]    The Harker Report concluded that oil became a key factor in "exacerbating the conflict in Sudan."[102]    As a result, it was "***difficult to imagine a cease-fire while oil extraction continues, and almost impossible to do so if revenues keep flowing to GNPOC partners and the GOS as currently arranged.***"[103]    The Report also criticized Talisman's oil extraction operations in Sudan for "contributing to the forced relocation of civilian populations residing in the vicinity of the oil fields in the interest of a more secure environment for oil extraction by the GOS and its partners, which include Talisman Energy Inc."[104]

230.    International media and high profile NGOs also chastised Talisman.  In October 2001, the New York Times ran a series of articles on Talisman's investments, focusing on the link between oil exploitation and the GOS's authoritarian repression.[105]    The U.S. Committee for Refugees and Immigrants—an NGO focused on helping forced migrants—also castigated

---

[100] Joel Baglole, Canada to Probe Talisman Energy on Sudan Business, Wall St. J., Oct. 27, 1999.

[101] *See* Canadian Ministry of Foreign Affairs, Human Security in Sudan: The Report of a Canadian Assessment Mission (Jan. 2000) ("Harker Report"), http://www.ecosonline.org/reports/2000/Human%20Security%20in%20Sudan.pdf.

[102] *Id.* at 26.

[103] *Id.* at 16 (emphasis added).

[104] *Id.* at 2.

[105] Norimitsu Onishi, Sudan Government Tops List of Those Causing Agony for Oil, N.Y. Times, Oct. 13, 2001; Bernard Simon, Oil Company Defends Role in Sudan, N.Y. Times, Oct. 17, 2001; Norimitsu Onishi, Oil Money Pulls Sudan Out of Its Isolation and Toward an Uncertain Future, N.Y. Times, Oct. 17, 2001.

Talisman, saying that the company was guilty of "the worst form of Western corporate irresponsibility."[106]

231.    In its 2000 Corporate Social Responsibility Report, Talisman acknowledged that its oil facilities in Sudan were used for military purposes, saying that the GOS's "use of oil infrastructure for non-defensive military purposes [was] of great concern to Talisman."[107]

232.    Talisman's CEO cited public pressure hurting the company's stock price as a reason for exiting Sudan.  Indeed, the announcement that the company would leave the GNPOC consortium raised its stock price by five percent, despite Sudan's being a small part of its operations.[108]

233.    Like Talisman, BNPP is a publicly held company, owned primarily by institutional investors.  Like Talisman, BNPP's reputation, and hence the value of the company, would have been hurt by its Sudan business, had BNPP not affirmatively concealed its involvement at the time, including for example, by failing to disclose its involvement in its public announcements, its annual reports, and public filings, at the time.

---

[106] U.S. Committee for Refugees and Immigrants, U.S. Committee for Refugees World Refugee Survey 2000 – Sudan, at 8 (June 1, 2000). http://www.refworld.org/publisher,USCRI,,,3ae6a8d133,0.html.

[107] See Fritz Brugger, Extractive Industries in Fragile States: Fueling Development or Undermining the Future?, at 180 (Graduate Institute of International and Development Studies, Geneva, 2013, Thesis No. 10). http://repository.graduateinstitute.ch/record/279321/files/PHDDEVSTUDIES-2013-012.pdf

[108] Richard Bloom and Lily Nguyen, Talisman Shares Rise on Sudan Sale, Globe and Mail, Oct. 31, 2002, http://www.theglobeandmail.com/report-on-business/talisman-shares-rise-on-sudan-sale/article25697061/.

234.    Lundin Oil, AB, a Swedish company, had the concession for Block 5A, just to the south of Block One.[109]  OMV, an Austrian company was Lundin's financial partner.[110]  The GOS was responsible for significant violence in Block 5A, which was perpetrated to enable the concessioners to develop the oilfield.  In the process, the GOS and the militias it sponsored indiscriminately killed, raped, and brutalized the local population.[111]

235.    Like Talisman, Lundin's involvement in Sudan also generated significant negative publicity and public pressure to divest.  In 2001, Christian Aid, the Anglo-Irish relief and development agency, presented evidence to Lundin's board highlighting the company's involvement in the ongoing human rights crisis.[112]  Similarly, in 2003, Human Rights Watch issued a report drawing public attention to Lundin's actions in Block 5A.[113]

236.    By the end of 2003, Talisman, Lundin, and OMV had all terminated oil operations in Sudan due to the pressure of public awareness and international scrutiny of their direct role in enabling the GOS to use its oil revenues to commit atrocities.[114]  *In contrast, BNPP, operating illegally and in secret, had no such pressure and continued its faithful and invaluable service to the GOS.*

*****

---

[109] Human Rights Watch, Sudan, Oil and Human Rights, at 2, 49 (2003).

[110] *Id.*

[111] *See* Human Rights Watch, Lundin: Willfully Blind to Devastation in Block 5A (2003), https://www.hrw.org/reports/2003/sudan1103/25.htm.

[112] Christian Aid, Christian Aid Presents Sudan Evidence to Lundin Oil Board (Mar. 23, 2001), http://reliefweb.int/report/sudan/christian-aid-presents-sudan-evidence-lundin-oil-board.

[113] *See* Human Rights Watch, Lundin: Willfully Blind to Devastation in Block 5A (2003), https://www.hrw.org/reports/2003/sudan1103/25.htm.

[114] Human Rights Watch, Sudan, Oil, and Human Rights, at 33 (Nov. 24, 2003) https://www.hrw.org/report/2003/11/24/sudan-oil-and-human-rights.

237.    Reflecting the extensive international reporting of GOS atrocities and their connection to oil, internal BNPP memoranda show that its senior officials were well aware that Sudanese oil money was financing the GOS's human rights abuses and that its support for what the GOS was doing was unquestionably premeditated and intentional.

238.    BNPP officials discussed the economic environment created by burgeoning oil sales, referring to it as "financial dynamism," while also acknowledging what was happening in Sudan as a "human catastrophe."[115]

239.    In an August 2005 email, a senior compliance officer at BNPP warned that the satellite bank system was being used to evade the Sanctions against Sudan, stating that the practice "effectively means that we are circumventing or avoiding the U.S. embargo on transactions in USD [U.S. dollars] by Sudan."[116]

240.    The DFS investigation of BNPP found that, "in December 2005, when a settlement with U.S regulators and Dutch bank ABN AMRO was announced for violations of U.S. sanctions law, the Head of Ethics and Compliance for BNPPNA wrote, '**the dirty little secret isn't so secret anymore, oui?**'"[117]

241.    The DFS investigation showed that "BNPP's senior compliance personnel agreed to continue the Sudanese business and rationalized the decision by stating that 'the relationship with this body of counterparties is a historical one and the commercial stakes are significant.  For these reasons, Compliance does not want to stand in the way.'"[118]

---

[115] Press Release, Cuomo Administration Announces BNP Paribas to Pay $8.9 Billion, Including $2.24 Billion to NYDFS, Terminate Senior Executives, Restrict U.S. Dollar Clearing Operations for Violations of Law (June 30, 2014), p. 2 ("6/30/14 NYDFS Press Release").

[116] OFAC Settlement Agreement, Ex. H, ¶ 10 (alteration omitted).

[117] 6/30/14 NYDFS Press Release, p. 2.

[118] *Id.*

242.    In 2007, a senior compliance officer at BNPP acknowledged that Sudanese banks with which BNPP dealt "play[ed] a pivotal part in the support of the Sudanese government which . . . refuses the United Nations intervention in Darfur."[119]

243.    When U.S. law enforcement officials warned BNPP that it was engaging in unlawful behavior, BNPP failed to cooperate honestly with the investigation.  It continued its unlawful conduct even after being told by U.S. regulators and its own legal advisors that it was violating the Sanctions, thereby facilitating the GOS's atrocities.

244.    Thus, BNPP continued to provide secret, essential, and illegal financial assistance to the GOS through 2007, and the GOS's atrocities and oil monetization were inseparable elements of an over-arching, depraved campaign in which BNPP willingly partnered.[120]

## I.    As a Result of an Array of Federal and State Investigations, BNPP Agreed to Two Criminal Guilty Pleas, Two Cease and Desist Orders, a Settlement Agreement, and a Consent Order

245.    *Five* separate U.S. and New York State government entities—FRB-NY, OFAC, DFS, DANY, and the DOJ through the U.S. Attorney for the Southern District of New York—investigated BNPP's illicit financial dealings with the GOS and Sudan.[121]  Each made a determination to exercise its discretion to launch an investigation in BNPP's conduct.  Each made a determination that its jurisdiction extended to BNPP and BNPP's conduct.  Each made a

---

[119] *Id.*

[120] Following BNPP's cessation of its financing of the GOS, Sudan's economy entered a recession. Though the split with South Sudan was one cause of the recession, another was the loss of BNPP's financing as the U.S. Sanctions finally took hold.

[121] The key role that New York played in BNPP's conspiracy is also evidenced by the entities that conducted the investigations and the Sanctions they imposed.  The United States chose to marshal its New York-based resources, including FRB-NY and the U.S. Attorney for the Southern District of New York.  Further, many of the structural changes the federal regulators demanded of BNPP were New York-based.

determination that it had authority to take enforcement actions against, or prosecute, BNPP. And each decided to exercise its discretion to take enforcement actions against, or prosecute, BNPP. In other words, an overwhelming array of U.S. and New York government entities decided that they had authority to regulate BNPP's conduct and did so.

246. These investigations culminated in two cease and desist orders, a settlement agreement, a consent order, and two criminal guilty pleas. They also resulted in an approximately $8.9 billion criminal forfeiture.

### 1. BNPP Pled Guilty to Violating U.S. Sanctions

247. BNPP's years of financial dealings with Sudan and its banks, as well as its financial dealings with Iran and Cuba, ultimately led to a guilty plea in 2014 for violating the laws of the United States, specifically conspiring to violate E.O. 13067, E.O. 13412, the regulations implementing the two Executive Orders, the IEEPA, and the TWEA.[122]

248. BNPP did not dispute the charges against it. Indeed, it stipulated that it had **conspired with GOS entities** to unlawfully facilitate transfers in U.S. dollars for Sudanese banks and engaged in devious conduct to avoid detection. As set out in the stipulated SOF supporting its guilty plea, BNPP agreed that these facts would, at a trial, be proved beyond a reasonable doubt. BNPP effectively admitted that it knowingly facilitated and supported the crimes of a lawless

---

[122] The U.S. Attorney's Office charged BNPP with this conspiracy on July 9, 2014. *See* Information, *United States v. BNP Paribas* (S.D.N.Y., filed July 9, 2014) (Docket 14-CR-460-LGS No. 002), attached as Ex. A, and is incorporated herein as if set forth in its entirety. BNPP pled guilty 19 days later. *See* Letter from Preet Bharara, United States Attorney for the Southern District of New York, Leslie Caldwell, Assistant Attorney General, Criminal Division, Department of Justice, and Jaikumar Ramaswamy, Chief, Asset Forfeiture and Money Laundering Section, Department of Justice, to Karen Patton Seymour, Esq., Sullivan & Cromwell LLP, *United States v. BNP Paribas, S.A.*, June 27, 2014, attached as Ex. B, and incorporated herein as if set forth in its entirety.

regime by providing the financial means by which the GOS committed widespread human rights violations against vulnerable citizens, including women and children.

249.    On May 1, 2015, the Honorable Judge Schofield of the District Court for the Southern District of New York entered judgment of the criminal conviction of BNPP and ordered BNPP to forfeit $8,833,600,000 to the United States and pay a $140,000,000 fine. ***The forfeiture was the single largest financial penalty ever imposed in a criminal case***. It reflects the staggering amounts of money involved in BNPP's illegal activities in Sudan, Iran and Cuba and the seriousness of BNPP's crimes. More than 70% of the forfeiture penalty related to BNPP's unlawful transactions with Sudanese banks, a penalty of such magnitude in the context of Sudan's economy that it further demonstrates that BNPP's actions were a substantial factor in the GOS's crimes.

250.    The stipulated SOF and the attached civil and criminal documents establish that, from as early as 1997, BNPP, its agents and affiliates, conspired with the SDNs, including those specifically designated by the Treasury Department as having their assets blocked from the U.S. financial system by virtue of being owned or controlled by, or acting for or on behalf of Sudan, to violate the Sanctions against the GOS by providing Sudanese banks with access to the U.S. financial system through its New York branch and other affiliates.

251.    BNPPSA admitted that, at all relevant times, BNPP knew that the GOS was a rogue nation that supported international terrorism, and was subject to the Sanctions. BNPP also knew or consciously disregarded numerous and authoritative accounts that GOS and its proxies engaged in human rights violations including forced displacement and extrajudicial killings.

252.    As admitted in the stipulated SOF, BNPP played a decisive role in financing Sudan's export of oil and was involved with at least a quarter of all exports and a fifth of all imports

for Sudan.  BNPP provided crucial financial support and aid to the GOS knowing this support and aid was crucial to the GOS's ability to obtain the resources to persecute its disfavored civilians. Indeed, BNPP's own compliance officer reminded other bank officers that the "Sudanese banks with which BNPP dealt 'play a pivotal part in the support of the Sudanese government which . . . refuses the United Nations intervention in Darfur,'"[123] and urged the bank to stop its support for Sudan's genocidal leadership.  BNPP thus knew that its aid to the GOS provided material assistance to the GOS in perpetrating the human rights violations and personal and property injuries suffered by Plaintiffs.

### 2.    BNPP Pled Guilty to Violating New York Law

253.    BNPP pled guilty to one count of Falsifying Business Records in the First Degree, in violation of Penal Law Section 175.10, and one count of Conspiracy in the Fifth Degree, in violation Penal Law Section 105.05.[124]  Under New York law, Falsifying Business Records is typically a class A misdemeanor under Penal Law Section 175.05.  However, it rises to the level of a felony when, as here, the falsification is done with the "intent to commit another crime or to aid or conceal the commission thereof."[125]

254.    Pursuant to the terms of the New York Plea, BNPP agreed to forfeit $2,243,400,000.[126]  BNPP also agreed to series of "conditions" of its plea, including: (*i*) that any report by a compliance consultant or monitor submitted to the Federal Reserve or DFS must also

---

[123] SOF, Ex. C, ¶ 20.

[124] Plea Agreement Between BNP Paribas SA and the District Attorney of the County of New York, June 30, 2014, attached as Ex. D, ¶ 2 ("New York Plea") and is incorporated herein as if set forth in its entirety.

[125] New York Penal Law § 175.10.

[126] *See* New York Plea, Ex. D, ¶ 14.

be submitted to the DANY;[127] (*ii*) implementing "compliance procedures and training designed to ensure that BNPP is made aware in a timely manner of any" request by any entity "to withhold or alter its name or other identifying information where the request or attempt appears to be related to circumventing or evading U.S. sanctions laws;"[128] (*iii*) reporting in a timely manner to DANY "any known attempts by any BNPP employees to circumvent or evade U.S. sanctions laws"[129] (iv) complying promptly with DANY's requests for documents, information, and to interview BNPP employees;[130] (*v*) complying with the investigations of other federal and state law enforcement and regulatory agencies;[131] and (*vi*) alerting DANY of "all criminal conduct by BNPP or any of its employees acting within the scope of their employment related to DANY's [i]nvestigation" and "any administrative, regulatory, civil, or criminal proceeding or investigation of BNPP relating to DANY's [i]nvestigation."[132]

255.    As part of the New York Plea, BNPP also admitted a series of facts in the "Factual Statement," which set forth its criminal conduct.  These facts are largely similar to those set forth in the SOF.[133]

---

[127] *See id.* ¶ 15(a).

[128] *Id.* ¶ 15(b).

[129] *Id*.

[130] *See id*. ¶¶ 15(e), (f), (g), (h), (i), (j), (k).

[131] *See* New York Plea ¶¶ 15(f), (i), (k).

[132] *See* New York Plea ¶¶ 15(m), (n).

[133] *See* Exhibit A to Plea Agreement Between BNP Paribas SA and the District Attorney of the County of New York, June 30, 2014, attached as Ex. E, and is incorporated herein as if set forth in its entirety.

3.    **BNPP Entered into Agreements with Federal and State Regulators Admitting Substantial Wrongdoing and Agreeing to Substantial Penalties**

256.    In 2004, FRB-NY and the DFS "identified systematic failures in BNPP's compliance with the Bank Secrecy Act," a federal statute that prevents money laundering, "and specifically highlighted deficiencies in [BNPPNY's] monitoring of transactions with overseas clients, including the processing of U.S. dollar transactions for overseas clients." [134]  To address BNPP's failures, FRB-NY and the DFS entered into a Memorandum of Understanding BNPP that required, *inter alia*, BNPPNY to "improve its systems for compliance with U.S. bank secrecy and sanctions laws."[135]  But at this time, the scope of BNPP's actions were apparently not known by the federal or New York state authorities.

257.    On June 30, 2014, BNPP entered into a cease and desist order with both the Board of Governors of the Federal Reserve System (the "Board") and the Autorité de Contrôle Prudential et de Résolution (the "ACPR"), one of BNPP's French regulators.[136]

258.    In the Joint Cease and Desist Order, the Board and the ACPR demanded that BNPP make a number of changes to the bank's structure.  BNPP made extensive use of New York's financial sector in order to carry out its federal and New York State crimes.  This fact is supported by the substantial structural changes set forth in the Joint Cease and Desist Order.  On information and belief, the regulators would not have required BNPP to make such modifications in New York

---

[134] SOF, Ex. C, ¶ 28.

[135] *Id.*

[136] *See* Cease and Desist Order Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended; Supervisory Cooperation Decision Applying the Joint Statement of French and US Banking Supervisors of May 24, 2004, Dkt. No. 14-022-B-FB, attached as Ex. F ("Joint Cease and Desist Order") and is incorporated herein as if set forth in its entirety.

if they had not thought that such internal structures and regulations in New York would have made BNPP's criminal activities less likely to have occurred.

259.    Another required change was that BNPP had to relocate part of its compliance function to New York.[137]  This group, known as "Group Financial Security," is "ultimately responsible for [BNPP's] OFAC Compliance Program."[138]  The regulators ensured that the group had the tools necessary to help prevent and catch future sanctions violations.  These included: (*i*) "audit[ing] any transaction and overall compliance efforts by any branch, affiliate, or business line [of BNPP];"[139] (*ii*) "serv[ing] as the ultimate arbiter of U.S. Sanctions issues and hav[ing the] authority to compel [BNPP's] branches, affiliates, and global business lines to comply with the OFAC Compliance Program;"[140] (*iii*) "establish[ing] norms and procedures for [BNPP's] global compliance with the U.S. OFAC Compliance Program;"[141] (*iv*) "review[ing] high-level alerts escalated from [BNPP's] monitoring and sanctions filtering processes, to the extent that there is a U.S. Sanctions component;"[142] (*v*) "specifically regarding USD clearing, oversee[ing] and supervis[ing] compliance with the U.S. OFAC Compliance Program by [BNPP's] USD clearing and payment business lines, including all USD clearing for [BNPP] processed globally, defin[ing] the standard compliance processes for USD clearing and payments as relevant to the U.S. OFAC

---

[137] Though the Joint Cease and Desist Order states that BNPP shall relocate the portion of the Group Financial Security responsible for OFAC compliance to the United States, the Settlement Agreement makes clear that the relocation is to New York.  *See* Settlement Agreement, Ex. H, *infra*.

[138] Joint Cease and Desist Order, Ex. F, ¶ 1(a).

[139] *Id.* ¶ 1(a)(i).

[140] *Id.* ¶ 1(a)(iii).

[141] *Id.* ¶ 1(a)(iv).

[142] *Id.* ¶ 1(a)(v).

Compliance Program, and provid[ing] a second level of control to ensure appropriate implementation of those compliance processes."[143]

260.    That same day, June 30, 2014, BNPP also entered into a second cease and desist order with just the Board.[144]  In this second order, the Board found that

> [f]rom at least 2002 through at least January 2010, [BNPP] developed and implemented policies and procedures for processing certain U.S. dollar ("USD") denominated funds through the [BNPPNY] and through other unaffiliated U.S. financial institutions involving parties subject to OFAC Regulations that omitted or concealed relevant information from payment messages that was necessary for the Branch and other U.S. financial institutions to determine whether these transactions were carried out in a manner consistent with U.S. law.  Although [BNPP] made certain efforts in 2007 and 2008 in an attempt to comply with OFAC Regulations, [BNPP] continued to process certain USD denominated funds transfers through the [BNPPNY] involving a party subject to OFAC Regulations through 2012.[145]

261.    Because of BNPP's "unsafe or unsound practices and violations of law,"[146] the Board assessed a civil penalty in the amount $508 million.  It also barred BNPP from employing those individuals who were the relationship managers for the GOS.[147]

262.    That same day, BNPP also entered into a settlement agreement with OFAC.[148]  The Settlement Agreement found that "[f]or a number of years, up to and including 2012, BNPP processed thousands of transactions to or through U.S. financial institutions that involved countries, entities, and/or individuals subject to the sanctions programs administered by

---

[143] *Id.* ¶ 1(a)(vi).

[144] *See* Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, Dkt. Nos. 14-022-B-FB, 14-022-CMP-FB, attached as Ex. G ("Cease and Desist Order") and is incorporated herein as if set forth in its entirety.

[145] Cease and Desist Order, Ex. G, at 2.

[146] See id.

[147] *See id.* at 4.

[148] *See* Settlement Agreement between the U.S. Department of Treasury's Office of Foreign Asset Control ("OFAC") and BNP Paribas SA ("BNPP"), COMPL-2013-193659, attached as Ex. H (the "Settlement Agreement") and is incorporated herein as if set forth in its entirety.

OFAC."[149]    Crucially, OFAC found that New York was an indispensable part of BNPP's conspiracy to violate U.S. sanctions law. BNPP used the financial system based in New York to process transactions on behalf of the GOS and the SDNs throughout the relevant period.[150]

263.    OFAC also described how BNPP's branches, including its branch in Switzerland, "routed [ ] USD payments to or through the United States in apparent violation U.S. sanctions."[151] BNPP's use of the United States' financial system, which, on information and belief, principally refers to New York, included the following:

a.    BNPP Suisse and BNPP Paris negotiated a variety of trade finance instruments on behalf of or that involved parties subject to U.S. sanctions on Sudan . . . and routed USD payments to or through the United States pursuant to these instruments; [and]

b.    BNPP Suisse, BNPP Paris, BNPP's branch in Rome, and BNPP's branch in Milan all processed correspondent banking or retail banking transactions to or through the United States that involved the interests of a person subject to U.S. sanctions on Sudan . . . .[152]

264.    Thus, the Settlement Agreement makes clear that the U.S. financial system, which is primarily based in New York, was an integral to BNPP's actions, irrespective of where the illicit transactions originated.

265.    In addition to terminating its unlawful conduct,[153] BNPP agreed to a settlement in the amount of $963,619,900 "arising out of the apparent violations by BNPP of IEEPA, TWEA," and the Executive Orders and regulations relating to sanctions on, *inter alia*, Sudan.[154]

---

[149] *Id.* ¶ 3.

[150] *Id.* ¶ 8.

[151] Settlement Agreement, Ex. H, ¶ 16.

[152] *Id*. ¶¶ 16(a), (b).

[153] *See* Settlement Agreement, Ex. H, ¶ 26.

[154] *Id.* ¶ 28.

266.    The day before, June 29, 2014, BNPP also entered into an extensive consent order with the DFS for its violations of New York banking law and the DFS's regulations.[155]    The DFS found that BNPP's "conduct violated U.S. national security and foreign policy and raised serious safety and soundness concerns for regulators, including the obstruction of governmental administration, failure to report crimes and misconduct, offering false instruments for filing, and falsifying business records."[156]

267.    The Consent Order stressed the New York locus of BNPP's crimes, stating that BNPP:

> engaged in a systematic practice, as directed from high levels of the Bank's group management, of removing or omitting the Sudanese . . . information from U.S. dollar-denominated payment messages that it sent through [BNPPNY] and other non-affiliated New York-based U.S. financial institutions to "guarantee the confidentially [sic] of the messages and to avoid their disclosure to any potential investigatory authorities."[157]

268.    BNPP agreed that during the relevant time period, its New York-based compliance team "intentionally" "did not have adequate legal and compliance authority to ensure that activities conducted from [BNPP's] offices outside of the United States complied with New York and U.S. laws and regulations."[158]    Indeed, one BNPP employee was quoted in the Consent Order as describing an "omission" procedure purposefully designed to "avoid[ ] putting [BNPPNY] in a position to uncover these transactions [on behalf of Sudan], to block them, and to submit reports to the regulator."[159]

---

[155] *See In re BNP Paribas, S.A. New York Branch*, *Consent Order Under New York Banking Law § 44*, New York State Department of Financial Services, attached as Ex. I (the "Consent Order") and is incorporated herein as if set forth in its entirety.

[156] *Id.* at 2.

[157] Consent Order, Ex. I, ¶ 3.

[158] Consent Order, Ex. I, ¶ 7.

[159] *Id.*

269.    In the Consent Order, BNPP agreed that it violated numerous New York banking laws and regulations—New York banking laws and regulations that it might not have violated had it not intentionally structured its legal and compliance departments to be insufficient to the bank's needs—in the course of processing financial transactions for Sudan.  Specifically, BNPP agreed that it: (*i*) "failed to maintain or make available at [BNPPNY] true and accurate books, accounts and records reflecting all transactions and actions in violation of Banking Law § 200-c;"[160] (*ii*) "made false entries in BNPP's books, reports and statements and willfully omitted to make true entries of material particularly pertaining to the U.S. dollar clearing business of BNPP at its [BNPPNY] with the intent to deceive" federal and state regulators "appointed to examine BNPP's conditions and affairs at its New York Branch in violation of Banking Law § 672.1;"[161] (*iii*) failed to inform the DFS "immediately upon the discovery of fraud, dishonesty, making of false entries and omission of true entries, and other misconduct, whether or not a criminal offense," in violation of DFS regulation 3 NYCCRR § 300.1;[162] (*iv*) actively flouted its agreement in the MOU to "remediate, among other things, [its] systems for compliance" with various banking laws and regulations;[163] and (*v*) caused the cancellation of the MOU by FRB-NY and DFS based on the provision of "falsified facts," including failing to inform the regulators of "BNPP's continuing and longstanding efforts to conduct secret transactions" for, *inter alia*, Sudan.[164]

270.    As a result of its illegal conduct, the DFS fined BNPP over $2 billion and ordered BNPP to "make payment of reparations and restitution to the Department and the State of New

---

[160] Consent Order, Ex. I, ¶ 43.

[161] *Id.* ¶ 44.

[162] *Id.* ¶ 45.

[163] *Id.* ¶¶ 46-47.

[164] *Id.* ¶ 50.

York in the amount of $1,050,000,000.00 for injury caused by its wrongful conduct."[165]  BNPP was required to suspend its U.S. dollar clearing services through the New York branch on behalf of various other BNPP entities for one year and on behalf of unaffiliated third party banks in New York and London for two years.[166]

271.    BNPP also agreed to extend for two years the term of an independent consultant on site in the New York Branch that DFS required pursuant to the terms of a 2013 memorandum of understanding.  Initially, the consultant was charged with reviewing BNPP's compliance with various anti-money laundering laws and regulations and OFAC's rules and regulations.  Under the terms of the Consent Agreement, the consultant's mandate was extending to "oversee[ing], evaluat[ing] and test[ing] BNPP's remediation efforts, the implementation of BNPP's efforts to streamline the global U.S. dollar clearing through the New York Branch and the U.S. dollar suspension requirements contained in" the Agreement.[167]  Finally, BNPP agreed to terminate or punish 45 employees.[168]

272.    In sum, the two guilty pleas and the three other agreements BNPP entered into establish the egregious nature of BNPP's criminal conduct and conspiring with the GOS.  They also make clear not only the role that New York played in that criminal conduct, but also New York's continuing interest in regulating BNPP's conduct, after its convictions.

---

[165] *See* Consent Order, Ex. I, ¶¶ 51-52.  The $1.05 billion fine was satisfied by BNPP's payment to the DANY.  *See id.* ¶ 52.

[166] *See id.* ¶¶ 53-54.

[167] *Id.* ¶ 56.

[168] *See id.* ¶ 57.

## V.    THE CAUSES OF ACTION ALLEGED HEREIN ACTION ARE TIMELY

273.    The applicable statute of limitations and tolling doctrine demonstrate that Plaintiffs have brought their claims alleged herein in a timely manner:

274.    Plaintiffs' claims are subject to tolling under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974).

275.    The putative class action, *Kashef v. BNP Paribas* No. 16-CV-3228 (S.D.N.Y.), was filed April 29, 2016.  The motion for class certification filed in *Kashef* on June 9, 2023 proposed a class period of November 1997 through December 2011.

276.    Here, Plaintiffs were all members of the proposed class in *Kashef*.  On May 9, 2024, the Court granted Plaintiffs' Motion for Class Certification, defining the class as "[a]ll refugees or asylees admitted by the United States who formerly lived in Sudan or South Sudan between November 1997 and December 2011."  The certified class is narrower than the class advanced in Plaintiffs' complaint,[169] and excludes Plaintiffs, formerly putative class members who are non-refugee and non-asylee Sudanese-Americans.

277.    Defendants BNP Paribas, S.A., and BNP Paribas US Wholesale Holdings, Corp. are also defendants in the *Kashef* proceeding.

278.    The Court previously held that the *Kashef* plaintiffs stated a claim for relief under Article 50.1 of the Swiss Code of Obligations. Plaintiffs here likewise bring a claim for relief under Article 50.1 of the Swiss Code of Obligations. Proof of Plaintiffs' claims will require evidence of the same wrongful acts as would proof of the claim asserted in the *Kashef* proceeding.

---

[169] "All U.S. citizens, lawful permanent residents, or lawfully admitted refugees or asylees who formerly lived in Sudan or South Sudan and who were subjected to human rights abuses (including forced displacement, genocide, battery, assault, unlawful imprisonment, sexual abuse, threats of violence and/or deprivation of property) perpetrated by the Government of Sudan ("GOS") and its agents." Pls' Third Am. Compl., ECF No. 241, ¶ 220.

279.    Plaintiffs reasonably and justifiably relied on the named plaintiffs in the *Kashef* proceeding to protect their rights, and they reasonably and justifiably relied on the class-action tolling doctrines articulated in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and *In re WorldCom Securities Litigation*, 496 F.3d 245, 256 (2d Cir. 2007).

280.    Under *American Pipe*, all putative class members are treated as if they filed their own individual actions, until they either opt out or a certification decision excludes them. *American Pipe*, 414 U.S. at 255.

281.    Accordingly, the claims here are deemed to have been brought as of the date they or similar claims were brought in the related class actions, and therefore the *Kashef* action tolled the limitation period for Plaintiffs' claims.

282.    The U.S. Court of Appeals for the Second Circuit found that the *Kashef* complaint was timely filed pursuant to NY CPLR § 215(8)(a). *Kashef v. BNP Paribas S.A*., 925 F.3d 53, 63 (2d Cir. 2019).

283.    Under NY CPLR § 215(8)(a), a civil action is timely so long as (1) a criminal action has been commenced, (2) against the same defendants, and (3) concerning the same event or transaction from which the civil action arose.

284.    For the purposes of CPLR § 215(8)(a), the termination of the criminal action is measured from the date on which the defendants were sentenced.

285.    BNPP was criminally prosecuted by federal authorities, which arose from the same occurrence from which Plaintiffs' causes of action arise.

286.    BNPP's judgment of conviction was entered on May 1, 2015.

287.    By filing this action, Plaintiffs are now preserving their right to pursue individual claims following the May 9, 2024 decision on class certification in the *Kashef* proceeding.

288.    Thus, for the reasons stated herein, Plaintiffs' claims are timely.

## VI.    CAUSES OF ACTION

**Violations of Article 50.1 of the Swiss Code of Obligations**

**(All Plaintiffs Against All Defendants)**

289.    Plaintiffs reallege and incorporate the preceding paragraphs by reference, as if fully set forth herein.

290.    Under Swiss law, secondary tort liability for accomplices is governed by Article 50.1 CO:

> Where two or more persons have together caused damage, whether as instigator, perpetrator or accomplice, they are jointly and severally liable to the person suffering damage.[170]

291.    Pursuant to Article 50.1 CO, Defendants are jointly and severally liable as accomplices for the economic and moral harms suffered by Plaintiffs as a result of the unlawful acts committed by the GOS and its agents.

292.    Plaintiffs suffered unlawful acts in the form of various human rights abuses, including forced displacement, committed by the Government of Sudan and its agents, detailed in paragraphs 29-109.

293.    These human rights abuses infringed on absolute rights of the Plaintiffs under Swiss law, including rights to life, bodily integrity and property.

294.    Defendants consciously assisted the Government of Sudan and its agents by providing financial support from 1997 through at least 2007. Defendants knew or should have

---

[170] The Swiss Code of Obligations is published online by the Swiss government, in an unofficial English translation: https://www.fedlex.admin.ch/eli/cc/27/317_321_377/en.

known, had they exercised due care, that their support would contribute to the Government of Sudan's violation of human rights during and after that time period.

295.    The conscious cooperation between Defendants and the Government of Sudan was the natural and adequate cause of Plaintiffs' injuries as detailed above.

296.    Without Defendants' financial support of the Government of Sudan, the abuses committed by the al-Bashir regime and its agents would not have occurred at the same time, in the same way or in the same magnitude.

297.    Defendants' conscious cooperation with the Government of Sudan was capable, in the ordinary course of events and common experience, of leading to the abuses committed by the Government of Sudan and its agents against Plaintiffs, which were objectively foreseeable.

298.    By their conduct, Defendants acted willfully, outrageously and with malice, oppression, bad faith and conscious disregard of the rights of Plaintiffs, and the probability of severe injury to Plaintiffs, justifying an award of punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar conduct.

## VII.    PRAYER FOR RELIEF

WHEREFORE, each and every Plaintiff prays for judgment against each Defendant as follows:

(a)    That judgment be entered against Defendants determining that they have committed the violations of law as alleged in this Complaint;

(b)    An award of damages including general and special damages, to the full extent legally available, in an amount to be determined at trial;

(c)    An award of punitive or exemplary damages to the full extent legally available, in an amount to be determined at trial;

(d)     For costs of suit, including attorneys' fees, pre-judgment and post-judgment

interest, expert witness fees, consultant fees, and other costs as and to the

extent permitted by law; and

(e)     For such other and further relief as the Court may deem just and proper.


Dated: May 11, 2024                         Respectfully submitted,


*/s/ Mary S. Van Houten Harper*              */s/ Kathryn Lee Boyd*
Mary S. Van Houten Harper                    Kathryn Lee Boyd
Michael D. Hausfeld                          Theodor Bruening
Scott A. Gilmore                             Michael Eggenberger
Amanda E. Lee-DasGupta                       HECHT PARTNERS LLP
Claire A. Rosset                             125 Park Avenue, 25th Floor
HAUSFELD LLP                                 New York, NY 10017
888 16th Street NW, Suite 300                (646) 502-9515
Washington, DC 20006                         (646) 396-6452
(202) 540-7200                               (646) 777-2489
mvanhouten@hausfeld.com                      lboyd@hechtpartners.com
mhausfeld@hausfeld.com                       tbruening@hechtpartners.com
sgilmore@hausfeld.com                        meggenberger@hechtpartners.com
alee@hausfeld.com
crosset@hausfeld.com
                                             Kristen Nelson
                                             HECHT PARTNERS LLP
                                             2121 Avenue of the Stars, Suite 800
                                             Century City, California 90067
                                             (646) 490-2408
                                             knelson@hechtpartners.com

                                             *Counsel for Plaintiffs*